Everett HADIX, et al., Plaintiffs,

v.

Perry JOHNSON, et al., Defendants.

Civ. A. No. 80–73581.

United States District Court,
E.D. Michigan, S.D.

July 1, 1988.

Larry Bennett, Butzel, Keidan, Simon, Myers & Graham, Patricia Streeter, Deborah A. LaBelle, Michael J. Barnhart, and Charlene M. Snow, Detroit, Mich., for plaintiffs.

Susan Harris and Elaine D. Fischhoff, Asst. Attys. Gen., Thomas C. Nelson, Lansing, Mich., for defendants.

## TABLE OF CONTENTS

| Description | Page Number |
|---|---|
| I. Background | 262 |
| II. The Issue | 262 |
| III. Procedures Used to Compile a Record Upon Which to Determine the Meaningfulness of Inmate Access to the Courts | 263 |
| IV. Proofs Submitted by the Parties and Court–Appointed Experts | 265 |
| V. Findings of Fact | 283 |
| VI. The Law | 286 |
| VII. Conclusions of Law | 291 |
| VIII. Remedy | 293 |
| IX. Conclusion | 298 |

### MEMORANDUM OPINION AND ORDER

FEIKENS, District Judge.

This is an action brought by a class of inmates against officials responsible for the administration of a portion of the state prison facility located in Jackson, Michigan known as the State Prison of Southern Michigan's Central Complex (hereinafter "Central Complex" or "SPSM–CC").

Plaintiff class consists of all inmates who are now or who in the future will be housed in the Central Complex. At the time of the trial, the Central Complex population had approximately 2,400 inmates. The transient population is nearly 10,000 persons each year.

There are ten original defendants in this case. They are sued individually and in their official capacities: Perry M. Johnson, Director of the Michigan Department of Corrections (now Robert Brown); Robert Brown, Deputy Director for the Bureau of Correctional Facilities (now Daniel Bolden); Graham Allen, Food Service Supervisor; Dale Foltz, Regional Administrator and Warden (now John Jabe); Elton Scott, Deputy Warden; Pam Withroow, Deputy Warden; Frank Elo, Deputy Warden for Security; John Jabe, Business Manager; Charles Utess, Classification Director; Marjorie Van Ochten, Hearings Administrator; and John Prelesnik, Superintendent of the Reception and Guidance Center.

## I. BACKGROUND

On September 18, 1980, the complaint in *Everett Hadix v. Perry Johnson* (hereinafter known as *"Hadix"*) was filed. The complaint raised numerous questions regarding inmates at the State Prison for Southern Michigan (hereinafter "SPSM"), their rights, conditions of confinement, and general aspects of prison life.

Class certification was granted on August 28, 1981.

Ten cases, filed between 1979 and 1985, raised similar issues and were consolidated with *Hadix*.[1]

Numerous proceedings were undertaken following class certification. As the issues were sharpened, negotiation and settlement became a goal. Several conferences between the parties were held and, on February 13, 1985, a comprehensive consent judgment was entered and filed.

The consent judgment deals with issues of sanitation; health care; fire safety; overcrowding and protection of inmates from harm; use of volunteers; access to the courts; food service; management (the ordering of a study to provide recommendations regarding organization, staffing and administration at the Central Complex); inmate legal mail; and compliance and inspection procedures. An integral part of the settlement is the break-up of one vast prison complex into five autonomous units.

By stipulation of the parties, a basic issue as to what constitutes compliance by defendants with the United States Constitution in providing meaningful access to the courts for inmates bringing civil actions was reserved for decision.

Another issue not resolved in the consent judgment relates to the classification of inmates. This issue was referred by stipulation for resolution in a matter pending in United States District Court for the Western District of Michigan, *United States v. State of Michigan*, Civil Action No. G84–63CA.

The issue of inmate access to the courts in *Hadix* has been refined as the case progressed. Plaintiffs' complaint alleged inadequate access to the courts as a civil rights violation based on Section 1983.[2] The consent judgment (of February, 1985), which reserved the issue for my determination, nevertheless settled related subjects such as library hours, facilities, and book collection; establishment of satellite libraries in certain segregated cell blocks; and inmate paralegal training.[3]

## II. THE ISSUE

The central issue raised by the complaint and answer (as preserved for my determination under the consent judgment) is this: whether, and to what extent, the defendants are constitutionally required to pro-

---

1. Cases consolidated for litigation with *Hadix* for various purposes are: *Thompson v. Johnson*, 79–74366; *Sommerville v. Milliken*, 80–70949; *Harris v. Johnson*, 81–73541; *Harvey v. McCormick*, 82–72377; *Stapleton v. Anderson*, 79–74041; *Roberts v. Johnson*, 83–6147AA; *McGrary v. Foltz*, 83–4433; *Randolph v. Suitor*, 81–71258; *Luster v. Anderson*, 78–72607; and *Gibson v. Scott*, 85–2530.

2. Allegations pertaining to meaningful access to the courts for inmates in the Central Complex may be found at paragraphs 97 through 106 of plaintiffs' first amended complaint, filed August 18, 1982.

3. Terms pertaining to meaningful access to the courts for inmates in the Central Complex may be found primarily in Section VI of the consent judgment, filed February 13, 1985.

vide access to the courts for inmates in the Central Complex through the provision of additional attorneys, paralegals (civilian or inmate), and other means to assist inmates with civil actions (including habeas corpus proceedings) and related matters (i.e., grievances).

Plaintiff class asserts that mere access to the law library system cannot provide meaningful access to the courts for inmates. The class argues that functionally illiterate inmates, indigent inmates, and those inmates housed in segregated cell blocks, do not have meaningful assistance in preparing civil matters for the courts merely through the state's furnishing a law library. The class also contends that the non-library resources available to Central Complex inmates (i.e., jailhouse lawyers and Prison Legal Services) are too unreliable to provide meaningful access to the courts for functionally illiterate, indigent, or segregated inmates who seek to bring civil actions.

Relying upon *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *reh'd following remand, Smith v. Bounds*, 610 F.Supp. 597 (E.D.N.C.1985) (legal assistance by attorneys is required to provide meaningful access to North Carolina inmates), *reconsideration den'd.*, 657 F.Supp. 1322 (E.D.N.C.1985), *second order entered* 657 F.Supp. 1327 (E.D.N.C.1986), *aff'd.* 813 F.2d 1299 (4th Cir.1987), *aff'd. on rehearing en banc* 841 F.2d 77 (4th Cir. 1988) (no reconsideration of district court judgment necessary), and related cases, defendants assert that their duty to assist Central Complex inmates in the preparation of civil cases, in such a manner as to provide meaningful access to the courts, is met through the furnishing of a law library system containing a minimally sufficient collection of legal texts. They argue that the availability of any non-library resources is an enhancement of the library system.

## III. PROCEDURES USED TO COMPILE A RECORD UPON WHICH TO DETERMINE THE MEANINGFULNESS OF INMATE ACCESS TO THE COURTS

Evidence on the access issue was submitted at a trial beginning May 31, 1985.

Plaintiff class, represented by a group of inmates from the Central Complex, was adjudicated to be indigent prior to the trial. Appointed attorneys presented plaintiffs' case and have continued in the role of counsel.

The presentation of proofs commenced on June 3, 1985 and continued intermittently thereafter.

Ten inmates testified on behalf of plaintiff class: Koster, Moore, Valeroso, Ramsey, Thornton, Martin, Ford, Beaudin, Douglas, and Moncure.

Plaintiffs also presented the testimony of James Wilbur and Sandra Girard, past and present directors of Prison Legal Services; James Neuhard, Director of the Michigan State Appellate Defender's Office; John Prelesnik, Superintendent of the Reception and Guidance Center; Norman Lefstein, Professor of Law at the University of North Carolina School of Law (stipulated expert on delivery systems for incarcerated persons—specializing in legal professional ethics); and Lonnie McIntyre, Associate Professor of Education at Michigan State University (stipulated expert in reading ability).

Plaintiffs' witness, John Prelesnik, Superintendent of the Reception and Guidance Center (intake unit), administers the placement test given to inmates. This test is the "standard achievement test, Form A," which measures reading and math skills. (Prelesnik, 6/4/85 pp. 155–156) The testing results are used to determine the educational level inmates have and what remedial education, if any, inmates should receive. The levels range from non-readers (below the fourth grade) to above the twelfth grade (college level).

Plaintiffs' witness, Dr. Lonnie McIntyre, is an Associate Professor of Education at Michigan State University. McIntyre has taught in public schools in Illinois and Michigan. As an expert witness for plaintiffs, McIntyre administered readability tests to inmates' writing samples. The samples were randomly selected. He also

determined the readability of legal materials to which an inmate might refer in preparing a case for submission to the judicial system.

The readability test as administered by McIntyre determines the difficulty of comprehension of written passages. McIntyre's readability test is actually comprised of four separate tests: the Gunning, the FRYE, the Rader, and the Fleshe. (McIntyre, 6/11/85 p. 398.)

Defendants are represented by assistant state attorneys general on behalf of the Michigan Department of Corrections. Defendants' presentation of testimony and documentary exhibits began June 16, 1986. Various Central Complex staff persons and Department of Corrections officials testified: Daniel Purple, SPSM Assistant Business Manager; Graydon Brown III, SPSM Mail Supervisor; Gerry Kunzelman, SPSM–CC Personal Affairs Officer; Herbert Grinage, SPSM–CC Assistant Deputy Warden for Housing; Lloyd Baker, SPSM–CC Grievance Coordinator; Paul Wreford, JCC Director of Prison Programs; Linda Hehl, Information Desk Sergeant; Stanley Januszka, 5 Block Assistant Resident Unit Manager; Chester Bristow, SPSM Fire Safety Officer; Melody Wallace, MDOC Litigation Coordinator; Arthur Barber, SPSM Sergeant; Lucinda Boyd, SPSM–CC Director of Library Services; James Thornton (adverse), inmate; Kenneth Limberg, SPSM–CC Academic School Principal; Clayton Birch, Legislative Corrections Ombudsman; Susan Herman, former MDOC Assistant for Prisoner Affairs; Frank Elo, SPSM Assistant Deputy Warden for Custody; Carl Little, SPSM–CC Grievance Coordinator; and Marjorie Van Ochten, MDOC Hearings Administrator.

Having heard testimony and read documentary evidence regarding the degree of meaningful access to the courts provided inmates at the Central Complex, I concluded that the parties were in basic disagreement as to what content an inmate's complaint required in order to present a legal question for which meaningful access to the courts had to be provided. The issue as to meaningful access to the courts is many sided. Usually, complaints by inmates, particularly in initial stages, are grievances regarding conditions of confinement. Many of these concerns raise no legal issues as that term is commonly understood. Yet, testimony clearly revealed that grievances, depending upon their nature and content, could and did result in legal questions if not resolved. It became apparent that a study of the grievance procedures used at Central Complex was vital to a resolution of the issue of meaningful access to the courts. At the same time, the existence and use of resources for the presentation of traditional legal issues had to be studied.

Accordingly, on June 23, 1986, I appointed two University of Michigan professors as experts: Charles Wolfson of the School of Social Work to study grievance procedures at the Central Complex and make recommendations and proposals, if any, for their reform; and Jerold Israel of the School of Law to study existing legal structures at the Central Complex and make recommendations and proposals, if any, for their reform.

These experts submitted written reports representing their joint findings in compliance with Rule 706 of the Federal Rules of Evidence. The reports were received as evidence. The experts were examined by each of the parties as to their work and their opinions.

Professor Jerold Israel, B.B.A., L.LB., the Alene and Allan F. Smith Professor of Law, prepared a study entitled "Report on the Extent of Inmate Legal Problems and Resources Available and Needed to Provide Meaningful Access to the Courts," (hereinafter "Israel"). Professor Charles Wolfson, M.S.W., of the School of Social Work, prepared a report entitled "A Study of the Grievance System at the Central Complex and Reception and Guidance Center, State Prison of Southern Michigan," (hereinafter "Wolfson"). Both professors have extensive practical experience in dealing with inmates' rights issues and have published a number of related materials. Although the reports were separately prepared, Profes-

sors Israel and Wolfson concur in their conclusions.

On June 30, 1986, plaintiffs presented rebuttal witnesses and concluded their proofs.

The parties presented additional proofs on November 17, 19, and 24, 1987 before agreeing to submit written closing arguments and proposed findings of fact and conclusions of law. That process is now completed and I now make my findings and conclusions as to the meaningfulness of Central Complex inmates' access to the courts.

## IV. PROOFS SUBMITTED BY THE PARTIES AND COURT–APPOINTED EXPERTS

### A. *Plaintiffs' Proofs*

*Herein are the contentions of plaintiff class:*

Proofs presented by plaintiffs addressed the legal assistance available to Central Complex inmates from any source. The library system was explained. Additional resources in the form of assistance from agencies or individuals were examined. The ability of certain inmates to make sufficient use of the forms of legal assistance available in the Central Complex was evaluated in light of the inmates' ability to comprehend written or spoken English, ability to pay for legal help, and ability, if segregated, to gain access to persons providing the aid.

### 1. Description of the Central Complex

The Central Complex consists of cell blocks denominated 4, 5, 6, 7, 8, 11, and 12 and the old infirmary building. Most of these facilities are used to house inmates segregated for various reasons. Cell block 4 is maximum security housing. Cell block 5 is divided into east and west divisions. Cell block 5 east houses inmates classified to punitive segregation, while cell block 5 west is used to house those in administrative segregation. Cell block 6 houses inmates classified to protective segregation. Cell block 7 serves as the Reception and Guidance Center (hereinafter "R & GC"). R & GC functions as an intake facility in which newly-arrived inmates are housed for the first weeks of incarceration. The old infirmary building also houses inmates classified to protective custody.

An inmate who is indigent, functionally illiterate, or for whom English is a second language may be housed in any cell block of the Central Complex, including the segregated units. One's status for purposes of placement in a cell block is not determined by ability or lack of ability to make use of available legal resource materials.

### 2. Description of Legal Assistance Resources

There presently exist several sources of legal assistance for Central Complex inmates. For example, Prison Legal Services, jailhouse lawyers, and complaint forms provided for *pro se* petitioners are offered as supplements to the legal texts contained in the library system. However, the Central Complex procedure relies primarily upon the provision of written sources of legal material for its entire inmate population regardless of housing situations. Other, non-library forms of assistance are not uniformly available for all inmates or for many types of civil actions an inmate might seek to initiate.

#### a. *Libraries*

The Central Complex furnishes a main library and several "satellite libraries." A library is also being furnished for inmates in maximum security custody (block 4). The satellite libraries are intended to assist inmates in segregated blocks who cannot use the main library because of special confinement.

The main law library is physically limited. The location of the facility is such that temperature control and adequate ventilation are not achievable. Only sixty-four inmates can be accommodated at one time. The heat, ventilation, and crowding problems are especially acute during popular use times such as Wednesdays and weekends. Prison work schedules effectively prevent spreading the use burden to other times during the week.

No group work areas are available apart from the library itself. As a result, the library must serve many functions. Inmates talk among themselves in the same room while others do research. Inmates in and around the library are permitted to play radios, to converse, and to engage in behavior which interferes with the ability of this facility to serve its function as a place of study and research.

As required by the consent judgment, the library is open fifty-six hours per week for inmate use. The library hours are varied according to the day of the week, but at least half of the scheduled times are in the evening or on weekends.[4]

General population inmates in cell blocks 8, 11, and 12 (approximately 1,000 inmates) are allowed access during these hours. Inmates receive "details" to go to the library for three periods of two hours each per week. More time can be requested if an inmate submits written evidence of a need to do additional research on his own case. (The head librarian makes the determination to grant more time although she is not trained in legal research.) The system does not readily accommodate matching assigned library times so that two inmates may work together. Generally, an inmate's request for a library detail requires one week to process. Not all detail requests receive responses. Inmates who are allowed to use the law library during the final two-hour period of a day are somewhat restricted in that books must be returned fifteen minutes before closing time.

The library resources do exceed the minimum collection specified in Appendix B of the consent judgment (Plaintiffs' exhibit 12) and are consistent with recommendations made by professional associations for contents of prison libraries.[5] However, the system by which inmates use the materials, the condition of the materials, and number of inmates seeking to use the materials make the use of the collection most difficult.

The Central Complex library is managed by a head librarian and her assistant. This head librarian supervises the librarians of the North and South Complexes as well. While she holds a master's degree in library science from the University of Michigan and has had experience in library work, neither the head librarian nor her assistant is trained to provide meaningful help in doing legal research. There is no evidence that either the head librarian or her assistant attempt to furnish inmates advice regarding legal research.

The library employs five or six inmates as library aides. These aides are not required to have training in legal research. The basic job qualification is an expressed interest in working at the library. The usual tenure of an inmate aide is one to eight months. (Boyd 6/24/86 pp. 94–100; 6/27/86 p. 21)

The work schedule for the aides is thirty to thirty-seven hours per week. Not all of the aides are at work in any one shift. Of the aides on duty, two are generally available to service inmate requests. Other aides on duty perform various clerical functions and miscellaneous tasks such as the segregated cell block check-out delivery runs. Only one aide is scheduled to work the evening shift, although at least one other aide is usually in the facility.

---

4. On Monday, the facility is open from 1:00 p.m. to 4:00 p.m. and from 6:45 p.m. to 9:00 p.m. On Tuesday, Wednesday, and Thursday, the library is available from 8:00 a.m. to noon, from 1:00 p.m. to 4:00 p.m., and from 6:45 p.m. to 9:00 p.m. The Friday schedule is from 8:00 a.m. to noon and from 1:00 p.m. to 4:00 p.m. On Saturday the library is open from 8:00 a.m. to noon and from 1:00 p.m. to 3:00 p.m. The Central Complex main law library is closed on Sunday. The library is also closed when the head librarian or her assistant are not scheduled or are not available.

5. *See* American Corrections Association, *Providing Legal Services for Prisoners: A Tool for Correctional Administrators* (1982); American Bar Association, Resource Center on Correctional Law and Legal Services, *Providing Legal Services to Prisoners: An Analysis and Report* (1973); and American Association of Law Libraries, *Collections for Institutional Law Libraries* (1980).

This limited number of inmate aides must locate materials for the inmates as the library is not set up as an open stack facility. When the library aides are busy, book requests may take significant time to fill. Testimony reveals delays of hours or the necessity of multiple trips to the window in order to fill one legal resource request. (Martin, 6/30/86 pp. 14–15) Some inmates experience difficulties in obtaining service at all. (Valeroso, 6/12/86 p. 45) Inmates are often unable to obtain books because an exact title is unknown and the aides are not able to determine which volume is wanted from the information the inmate provides, or the inmate is unable to communicate in English. (*See* Valeroso, 6/12/86 pp. 45–49 (no non-English law books); Martin, 6/30/86 pp. 13–15; and Boyd 6/24/86 p. 98)

An inmate may use only three to five volumes in the library collection at any one time. Each volume of a set is counted for this limit including multi-volume service materials. (*Shepard's* is generally exempt from the three-volume rule.)

In most instances, only one copy or set of a particular legal resource is available for all inmates. Limited numbers of frequently used materials such as the rules of procedure and statutes are provided. The library cannot guarantee a ready copy of fundamental legal materials at any one time.

Volumes from the main library are not always available as inmates in segregated blocks may "check out" materials. Books may be out of the main library for more than twenty-four hours due to this program.

Although the consent judgment provides for maintaining and updating library materials through the purchase of replacements and pocket parts, the collection cannot be termed complete at any one time because the library cannot keep pace by furnishing replacements for missing or unusable items. The librarian stated a reluctance to immediately replace missing volumes once their absence is discovered. She said she prefers to wait to determine if the missing books will eventually be returned. Of the volumes actually available, several are partially or completely mutilated. Many books have sections torn out.

No systematic inventory procedure exists to monitor the condition of the collection on a consistent and timely basis.

The process by which damaged volumes or volumes missing pages are repaired is time-consuming. The librarian requests a complete text from another complex. A copy of the required materials is made. This copy is then glued into the Central Complex book. The procedure takes from two to three weeks to complete. Typically, ten to forty-five volumes may be removed from circulation and undergoing some stage of this repair process. (Moncure, 6/30/86 pp. 26–27; Ramsey, 6/13/86 pp. 25–26)

Limited photocopying is available on the library premises. This issue is of particular importance to an inmate who has found legal materials he believes he needs to prepare his case. Unless he can copy the items, an inmate risks losing their use to another inmate who may check out the same materials.

An inmate who requires copies of any library materials has two choices. The inmate may handcopy materials or he may place a request for photocopying. In either case, the procedure ties up library resources for significant periods. (Kunzelman, 6/17/86 p. 95 (approximately 2,000 to 3,000 copies per month are made for Central Complex inmates))

If an inmate is able to pay for the photocopying service (at ten cents per page— Kunzelman, 6/17/86 p. 110; with no limit on the number of pages—*Ibid.* at p. 95) or has been classified as indigent,[6] the request

---

**6.** Indigency status takes a week to process after application and is subject to periodic review. In order to be determined indigent, an inmate must have an average monthly balance of seven dollars or less in his prison account. (Kunzelman, 6/17/86 p. 102)

Copying for indigent inmates is available only for items where handcopying is not at all feasible. (*Ibid.* at p. 95)

for photocopies is processed. The library handles the procedure, but generally sends the materials to another section of the prison facility for the actual copying. A Personal Affairs Officer oversees the photocopying. The time required for copying varies with the request load, but generally takes at least three to four days.

Approximately 1,200 of the Central Complex inmates do not have direct access to the facilities of the main law library. Instead, inmates in the segregated cell blocks and the old infirmary have limited use of "satellite libraries" or may obtain legal library materials only by means of a check-out system from the main law library.

Minimal libraries have been established for use solely by inmates in segregated cell blocks. Former cells in blocks 5, 6, and 7 have been converted to satellite libraries for use by some of the segregated inmates. This conversion was accomplished pursuant to the consent judgment and a Department of Corrections policy directive (OP–SMI 61.-04). Typically, a cell block satellite library consists of a regular-sized cell at the end of a gallery such as in block 5 west. These facilities contain approximately five shelves and a small table.

Appendix B of the consent judgment includes a list of the required "Minimum Collection for Administrative Segregation Law Libraries." That list indicates that annotated Michigan laws, basic treatises (e.g., Nutshell series publications), policy directives, outdated Shepard's Advance Sheets, and rules of procedure are to be provided. Testimony on behalf of plaintiff class indicated that the cell block satellite libraries contain little more than copies of the rules of procedure, policy directives, and outdated supplements.

The satellite libraries are not staffed.

No reliable inventory system has been established for the satellite libraries.

Supporting materials are generally not provided in the satellite libraries. The availability of writing supplies in these cell block libraries is unreliable. The facilities do not contain a typewriter.

Access to the satellite libraries is restricted and uncertain. Only inmates in a particular segregated cell block may use that cell block's facility. An inmate must file a request with a block sergeant for permission to use the satellite library at a certain time. Under the consent judgment, personal access is limited to two hours per week for each inmate. Only one inmate at a time may use the satellite library in the cell block. Scheduling conflicts are frequent. Inmates report that they are unable to have access to the satellite libraries on a regular basis.

Inmates held in segregated blocks may obtain materials directly from the main law library of the Central Complex by means of a check-out system. As plaintiffs note, this program is the only source of access to legal materials for segregated inmates who cannot obtain permission to use the limited facilities of the satellite libraries.

The check-out system allows inmates housed in the segregated cell blocks to request materials from the main law library. Processing time for a check-out request varies. Books requested by inmates are supposed to be brought to the segregated cell blocks by one of the library aides three to five days a week. An inmate can attempt to check out up to five volumes or other legal resource items at a time. The materials may be kept only twenty-four hours or until the next library run. Books are brought on an as-available basis (i.e., a book is not provided if another inmate has requested it, for use in the main library or by check-out, or if the volume is out for repair or photocopying). The delivery system is cumbersome and unreliable as one library clerk is given responsibility for the check-out program in all the segregated cell blocks.

A library is in the process of being constructed in the maximum security facility, cell block 4. Inmates housed in block 4 are to be provided the same basic materials as those available in the main law library, but this project is not yet complete and cannot be evaluated. Cell block 4 inmates may obtain materials through the check-out system in the interim.

The law library system for the Central Complex is thus composed of three main components: (1) the main law library; (2) the satellite libraries of the segregated cell blocks; and (3) the check-out system by which inmates in segregated cell blocks may request materials from the main law library. The legal resources available from the library system take the form of texts written in the English language. The materials are to be used on-site in the library or are available in restricted numbers for overnight use under the check-out procedure.

This provision of a law library system is claimed by defendants to be a minimal, but constitutionally-sufficient, form of meaningful access to the courts as mandated in *Bounds v. Smith, supra,* for all the inmates of the Central Complex regardless of the inmates' ability to utilize the library materials. *But see Smith v. Bounds,* 610 F.Supp. 597, *infra.*

b. *Needs and Resources for Non-Library Legal Assistance Available in the Central Complex*

The bulk of plaintiffs' proofs regarded legal resources other than a library system. Plaintiff class presented proofs concerning their perceived needs as well as the means by which the Central Complex now attempts to meet those needs.

(1) Needs Are Based Upon Illiteracy, Indigency, and Segregated Confinement

Plaintiff class contends: (1) that functional illiteracy, indigency or near-indigency, and segregation prevent the meaningful use of written, English-language library materials offered in the Central Complex library system; (2) that the texts cannot be of assistance to those who cannot read them; and (3) that a scarcity of basic texts causes those without funds for copying materials or those who cannot directly use the materials in the main library to sustain significant delays in obtaining legal resources or to forego potentially advantageous legal resources.

Plaintiffs presented the needs for legal assistance other than that available in a law library system by offering proofs with regard to inmates' reading comprehension, their ability to pay for legal assistance from other inmates, and the problems created by confinement to segregated cell blocks. Plaintiffs emphasize that at least twelve hundred inmates of the Central Complex are housed in segregated cell blocks. I now outline plaintiffs' claims with respect to inmate illiteracy, indigency, and lack of means by which inmates who cannot use the library may seek non-library legal assistance in the Central Complex.

(2) The Acute Problem of Illiteracy

Illiteracy or an inability to use (read and write) and understand the English language precludes twenty to fifty per cent of the inmates from using any law library materials.[7] An inmate may be "actually" or "functionally" illiterate. Status as an illiterate person is based upon an inmate's reading level (as demonstrated by the re-

---

**7.** *See* the literacy testing and results as analyzed by McIntyre (McIntyre, 6/11/85 pp. 396 *et seq.*). (Note: the percentage or population figures of inmates who have some English as a second language have not been made available to this court as of the date of this opinion.)

In addition to his examination of test results, McIntyre analyzed twenty kites, or requests, written by inmates and other documents. (McIntyre, 6/11/85 p. 394; Plaintiff's exhibits 17, 18 and 19.) McIntyre also examined the "readability" of the standard achievement tests given to the inmates by the prison officials: the GED test, the LSAT test, and various other materials (McIntyre, 6/11/85 p. 395). He also determined the level of difficulty of representative legal materials. (*Ibid.*) Results (in terms of grade levels) were as follows:

(references are to pages of testimony by McIntyre on 6/11/85)
(1) Letter from the Michigan Court of Appeals informing the inmate of his rights. 14.-5. (p. 400);
(2) *Glover v. Richardson, infra.* 15.5. (p. 401);
(3) SAT (test, Exhibit 20). 12.68. (p. 401);
(4) GED (test, Exhibit 21). 7.41. (p. 401);
(5) LSAT (test, Exhibit 22). 14.27. (p. 401);
(6) Exhibit 26 (var. documents). 20.1. (p. 402);
(7) Exhibit 27 (var. documents). 17.47. (p. 402); and
(8) Rules, forms (Exhibit 23) (*cf.* p. 395). 16.-011. (p. 402).

sults of the standard achievement tests administered upon intake into the Central Complex).

The reading level for Central Complex inmates was determined from a sample of over one hundred scores resulting from intake testing done in the Reception and Guidance Center (administered by the prison officials) and a review of inmates' writing samples.[8] (McIntyre, 6/11/85 pp. 394–403) Based on the results of McIntyre's examination, the average reading level (ability to comprehend) of the sample of inmates was grade six to six and one-half.[9] (McIntyre, 6/11/85 pp. 396–399)

Approximately twenty per cent of the inmates tested were "actually" illiterate (capable of reading only below the fourth grade (4.0) level).[10] (McIntyre, 6/11/85 p. 446)

The percentage of inmates who are "functionally" illiterate (i.e., who cannot read with adequate comprehension) was not determined with specificity. However, the average inmate (i.e., one reading at the sixth and one-half grade level) lacks ability to comprehend and reason using relatively unsophisticated legal materials according to plaintiffs' expert.[11]

### (3) General Assistance Given the Illiterate

No formal program exists at the Central Complex to provide legal assistance to functionally illiterate inmates who cannot read and utilize the legal texts of the library system. Other, general assistance with reading is available.

#### (a) *Adult Education*

The Central Complex provides an adult education program for inmates who are characterized as "non-readers" (i.e., the average inmate who reads and writes at seventh grade equivalency or lower). (Limberg, 6/27/86 pp. 80–81) The program is also intended to serve as a tutorial aid for those inmates who do not possess sufficient command of the English language. This remedial course consists of a series of classes designed to assist an inmate in developing basic reading and writing skills. (Limberg, 6/27/86 pp. 80–81) The course does not address legal research or complaint preparation.

#### (b) *Personal Affairs Officer*

The Personal Affairs Officer will read mail for an inmate who has a reading deficiency. (Kunzelman, 6/17/86 p. 100) The service provided is limited. That Officer does not assist in preparing written materials for inmates and is not trained in legal research or in the preparation of legal papers.

#### (c) *Inmate Organizations*

Some inmate organizations at the Central Complex have attempted to provide translation services for fellow inmates. For example, HASTA, a group comprised of Hispanic inmates, attempts to assist Spanish-speaking inmates. The efficacy of this type of assistance is limited by the expertise of the inmates providing the services.[12] At most, a jailhouse lawyer who speaks the native, non-English language of an inmate might be available to assist in preparing a case for presentation to a court. (See the discussion of the value of jailhouse lawyers as a consistent source of reliable legal assistance, *infra.*)

---

**8.** *Ibid.*

**9.** This average was obtained by treating those under 4.0 as 3.9 (as the test does not distinguish any level below 4.0), and by treating the scores over 12.0 as 12. (McIntyre, 6/11/85 p. 396). Plaintiffs' exhibit 24, the "reading spread" of the inmates tested, indicates that fifty per cent of the inmates tested read below the fifth grade level.

**10.** *See* the literacy testing and results as analyzed by McIntyre. (McIntyre, 6/11/85 pp. 396 *et seq.*)

**11.** McIntyre, 6/11/85 p. 446. McIntyre opined that the functionally illiterate inmates could not use legal materials to prepare meaningful papers for submission to the courts.

**12.** *See* testimony of person who said he could speak Spanish, but who was not trained to provide assistance in doing legal research (Graydon Brown III, p. 33 lines 10–18).

#### (4) Non–Library Legal Assistance

Coupled with proofs of functional illiteracy, plaintiffs presented a review of the types of non-library or non-written legal resources available to the inmates of the Central Complex.

(a) *Jailhouse Lawyers*

Perhaps the most prevalent form of assistance available to inmates is the advice and work of the writwriters or jailhouse lawyers. As many as a hundred inmates may be holding themselves out as jailhouse lawyers in the Central Complex. Their utility is severely restricted by factors of skill, fees charged, and prison regulations.

Skill levels of the jailhouse lawyers vary considerably. (Thornton, 6/13/86 p. 74; Ramsey, 6/13/86 pp. 33, 37, and 41) The quality of their work is thus questionable. "While some are able, others lack the capacity to either understand the law or to apply it to a specific fact situation. They rely almost entirely on a capacity to write documents that use legal terminology but say very little." (Israel, p. 48) Of those inmates who claim to be jailhouse lawyers, perhaps only a dozen have any competency in fact (*see, for example*, Thornton, 6/13/86 p. 74). Any expertise is traditionally limited to matters of criminal law, the jailhouse lawyer having learned his law by working on his own case, by taking some portion of the Jackson Community College paralegal training program, or by talking with other inmates. (Israel, p. 48; Ramsey, 6/12/86 pp. 87–91; and Thornton, 6/13/86 pp. 57–58)

The Central Complex has no program for permitting only competent jailhouse lawyers to offer assistance or of requiring a jailhouse lawyer to offer assistance only in legal areas with which he has some familiarity.

Even if an inmate could find a competent jailhouse lawyer, the cost of his services would be prohibitive. (Girard noted fees such as $2,000, Jordan noted fees of $700–$800 per appeal, Douglas noted having to pay a jailhouse lawyer or to do chores for a jailhouse lawyer in order to get help on his case, and Ramsey noted fees ranging from a jar of coffee and stamps to a few hundred dollars.)

Eighty-two per cent (some 1,774 out of the 2,168 inmates listed with spendable prison account balances in Defendants' exhibit 90) had balances of eighty dollars or less in October of 1987. At least 120 inmates have seven dollars or less in their accounts. (Kunzelman, 6/17/86 pp. 104–105) Thus, the majority of the Central Complex inmates are indigent or do not possess sufficient funds to pay fees charged by jailhouse lawyers. (*See* Defendants' exhibit 90)

Illiterate inmates are the least likely to have funds necessary to hire legal assistance. One who cannot function with adequacy in the use of the English language is least likely to be employable. Work available to an illiterate inmate is often low-paid, commensurate with comprehension skills.

Jailhouse lawyers said that they and their counterparts regularly charge fees for their services, despite prison regulations which prohibit this (*See* Rule 617 and Department of Corrections' Regulations *Ad.Code R. 791.6617*). The no-fee rules are ignored or not enforced. No incentive exists to induce jailhouse lawyers to perform work *pro bono*, and they do not.[13]

Prison regulations and practices also preclude a jailhouse lawyer from offering effective assistance to an inmate. The record already discussed notes difficulties due to scheduling conflicts and space constraints faced by inmates trying to work together. In the segregated cell blocks, inmates cannot work together at all. Similarly, as plaintiffs note, any additional library time is granted to inmates to work only on their *own* cases. The lack of facilities also prevents any privacy of communications between an inmate and another act-

---

**13.** Retaliation or a perception of retaliation against a jailhouse lawyer by prison officials if the inmate works on a case against the prison or its officials is expected by inmates. The *Hadix* litigation has required entry of two anti-retaliation orders. Hearings are pending on additional alleged retaliation.

ing as his jailhouse lawyer if they are allowed to meet. The amount of materials an inmate may retain in his cell is controlled. Legal materials are exempt from this rule, but are interpreted to mean only materials pertaining to the inmate's own case. Administrative and security concerns act generally to prevent any inmate from effectively conferring with another inmate to enable preparation of cases for submission to the courts.

Once a jailhouse lawyer begins work on a case for another inmate, there is no guarantee that he or his client will remain in the same facility during the life of the case. If either inmate is transferred (the frequency and probability of transfer are illustrated by Thornton, Douglas, and others, 6/16/86 p. 52), legal assistance ends. The client inmate must start the search for legal advice anew even though he may have already expended significant sums of time and money in an effort to get competent assistance.

### (b) *Inmate Paralegals*

Another legal assistance resource defendants offer to the inmates in the Central Complex is the inmate paralegal program. Plaintiffs' proofs noted that most of the drawbacks of utilizing jailhouse lawyers also apply to the inmate paralegals. No means exist to prevent an inmate paralegal from charging fees for his services. Further, as inmates, these paralegals are subject to prison practices and procedures governing the administration and maintenance of security of the facility. Thus, obstacles to arranging meetings, working together, obtaining any privacy, securing library research time, and retaining papers hamper the effectiveness of the inmate paralegal. The reality of frequent transfers likewise limits the ability of an inmate paralegal to proceed with a client inmate's case. (Girard, 6/16/86 pp. 62–64—inmate assistant transferred and trial held in absence)

The term "paralegal" suggests a level of expertise not often possessed by an inmate. To claim that an inmate paralegal possesses skills beyond that of a jailhouse lawyer may be an overstatement. Both the jailhouse lawyer and the inmate paralegal have questionable credentials. Apart from the labels, both have merely had an opportunity to attend classes designated as part of a paralegal training program sponsored by a neighboring community college.

The Central Complex does not have an inmate paralegal training program. Instead, inmates may avail themselves of a series of classes offered by Jackson Community College ("JCC"). JCC is responsible for setting the standards for admission and for the subjects offered the inmates. These courses are generally taught by local lawyers and law students. No internship or practical experience is provided in the curriculum. No evaluation is made of the efficacy of the program.

Most inmates do not continue beyond the initial phase of the program at JCC, which concentrates on criminal law. Through June of 1986, less than two dozen out of some three hundred inmates enrolled had completed the training. Transfers, a lack of ability, or a willingness to start "practicing" in criminal law are reasons cited for the low graduation rate. (Wreford, 6/23/86 pp. 17–28)

The only supervised role for an inmate paralegal is in the Prison Legal Services Office ("PLS"). Inmates there work under the direction of attorneys in providing legal assistance to other inmates. However, as the PLS Program Director, Sandra Girard, has testified, even the inmates who have completed the paralegal training program are able to offer only limited aid.

### (c) *Prison Legal Services*

Probably the most useful form of non-library legal aid available to Central Complex inmates is provided by Prison Legal Services. PLS was established as a source of legal assistance for all inmates in the entire prison facility at Jackson. The reality is far from the ideal, however. The staff is few in number. As indicated above, any expertise of the inmate staff is questionable. The subject matters addressable by the staff are restricted. Security considerations restrict PLS from be-

ing able to effectively assist inmates. A history of the facility is illustrative.

Initially funded by grants from the State Bar of Michigan and from the Law Enforcement Assistance Administration, PLS was conceived as an ameliorating office to deal with the growing number of *pro se* actions brought by inmates whose pleadings were often incomprehensible. The funding for PLS continued in the Department of Corrections' budget in the 1970's once the grants terminated. In the early 1980's, the Department of Corrections sought to terminate the PLS program. I issued a preliminary injunction requiring that the services of this facility continue pending the decision in this case.

PLS operates pursuant to a contract with the Department of Corrections (Plaintiffs' exhibit 40). This agreement governs such items as the budget, the governing board, the subject matters, and similar aspects of PLS operations.

According to its contract, "operational and administrative control and responsibility" are vested in the PLS Board of Trustees. This independence from the state seems illusory. Funding and other financial matters remain the province of the Department of Corrections. It is the Department of Corrections which inspects the PLS offices at least every quarter to determine whether programs are being carried out in compliance with the contract. Further pressure is exerted by the state in that the Department of Corrections has announced intentions to eliminate PLS. PLS attorneys may be providing legal services which facially appear to violate standards of professional ethics regarding independence.[14] The duty of PLS to responsibly provide legal assistance for inmates may be impaired by constraints on its ability to operate independent of the Department of Corrections.[15]

The professional staff of the PLS facility is limited. Sandra Girard, the director, is an attorney who divides her time between administrative matters and service to the inmates. Two other attorneys are on staff. One of these staff attorneys works full-time at the Central Complex except for one day of work each week at the North Complex. The other spends at least sixty per cent (and usually eighty per cent) of his time at another institution. In effect, PLS devotes the services of perhaps 1.8 lawyers to inmate matters.

The PLS staff also includes three inmate paralegals and a few paralegal trainees (also inmates). These individuals do not work solely on Central Complex inmate matters.[16] The average tenure of these inmate paralegals is measured in terms of a few months or, at the other extreme, many years. Their training consists of portions of the program sponsored by JCC (*see* (b), this section, above) and such guidance as the staff attorneys are able to give.

In theory, most of the legal work done by PLS is to be performed by paralegals under the supervision of the attorneys. This necessarily presumes adequately trained paraprofessionals acting independently most of the time. The attorney's supervision would hopefully consist of a review of major issues and final products.

In reality, plaintiffs assert, the inmate paralegals can only attempt to do most of the work in PLS subject to an attorney's review. The staff inmates are not consistently capable of performing even simple legal reasoning and drafting functions because of the limited training available. Many of the security restraints applicable to inmates extend to those on the PLS staff. For example, inmate paralegals cannot visit Central Complex inmates housed in segregated cell blocks. Thus, plaintiff class contends, inmate paralegals cannot function as paraprofessionals in the traditional sense, and the equivalent of two attorneys in PLS must bear the burden of

14. Lefstein, 6/4/85 pp. 101–131 *referencing* the Code of Professional Conduct, Michigan Bar Opinions, and American Bar Association standards.

15. *Ibid.*

16. Israel, p. 84, perhaps sixty to seventy-five per cent of staff time is devoted to Central Complex matters.

providing legal services with minimal assistance from inmates on the staff.

The staffing available for PLS results in an attorney-to-inmate ratio of approximately one to 1,200 (less than two attorneys for some 2,400 inmates).[17] Both the American Correctional Association and the American Bar Association have issued reports recommending a ratio of one attorney to 400 inmates.[18] Even where the support of civilian paralegals is available to a staff attorney, the American Bar Association recommends a ratio of one attorney to 800 inmates.[19]

Plaintiffs assert that the PLS attorney/inmate staff cannot meet the legal assistance needs for those inmates who are indigent, functionally illiterate, who speak no English, or who, because of their segregated status, have restricted access to a law library. The sheer number of requests for assistance overwhelms the capacity of this legal services arrangement to provide inmates meaningful access to the courts. The PLS staff has been adjudicated not adequate for the demands placed upon it.[20] PLS must place an inmate on a waiting list for aid in any of several civil actions categories. Plaintiffs offer this as evidence of the insufficiency of PLS as a legal resource.

Plaintiff class presented nothing in their proofs which would permit an assessment of PLS output in terms of documents produced or appearances made in courts on behalf of inmates.

The PLS operation, by contract and in fact, does not have the task of providing legal assistance for inmates who do not speak or write in English. Plaintiffs sum up their proofs with the contention that budgeting and other constraints on resources and operations prevent PLS staff members from meeting the particular legal assistance needs of Central Complex inmates who are functionally illiterate, indigent, or segregated.

PLS is the only formal program of legal assistance consistently available to Central Complex inmates seeking to bring civil cases to the courts.

### B. Defendants' Proofs

*Herein are the contentions of defendants:*

#### 1. In general

Defendants assert that meaningful access to the courts for Central Complex inmates filing civil actions is provided by means of a sufficiently stocked and maintained law library. The bulk of their proofs consequently addresses the state of that library system.

Defendants' proofs attest to the provision of a law library system within the Central Complex which is stocked with the minimal collection necessary under constitutional standards and which is accessible to inmates either directly or by means of a materials check-out program.

Like plaintiffs, defendants note the availability of jailhouse lawyers and other inmates to aid their fellow inmates in the unsegregated prison population.

While defendants note that the inmates who testified (seven of ten of whom are jailhouse lawyers) described only limited personal difficulties in bringing their complaints before the courts, plaintiffs argue that this is of little significance in light of the claims of plaintiff class as a whole. Plaintiffs claim that defendants have no program to aid functionally illiterate, indigent or segregated inmates in the preparation of legal papers and that defendants

---

17. Given a transient population of some 10,000 inmates, the ratio of attorneys to inmates might be calculated as one to 5,000.

18. Lefstein, 6/4/85 p. 117 *referencing* "American Corrections Association brochure" at p. 4, as admitted with Plaintiffs' exhibit 8 (probably A.C.A., *Providing Legal Services for Prisoners: A Tool for Corrections Administrators* (1982)). *See also* note 19, *infra.*

19. American Bar Association, Resource Center on Correctional Law and Legal Services, *Providing Legal Services to Prisoners: An Analysis and Report* (1973). *See* note 5, *supra,* and Israel at p. 43.

20. *See Knop v. Johnson,* 667 F.Supp. 467 (W.D. Mich.1987) and Israel at pp. 26–39 and pp. 54–56.

offer no assurance of future legal assistance for such inmates.

## 2. Additional Sources of Legal Assistance

Defendants presented proofs as to other, general forms of legal assistance available to Central Complex inmates.

Various entities outside the prison system offer limited assistance for judicial or administrative relief for Central Complex inmates. These resources include organizations such as the State Appellate Defenders Office ("SADO"), state agencies such as the Office of the Legislative Corrections Ombudsman, and individual attorneys who may be working *pro bono* or for contingency fees.

### a. *SADO*

SADO was established primarily to provide representation to inmates convicted of crimes who are unable to afford counsel to assist in their appeals of right. (Neuhard, 6/3/85 p. 15)

Approximately twenty SADO attorneys represent inmates in the various state facilities. (Neuhard, 6/3/85 pp. 11–15)

The SADO process is straightforward. Upon order of appointment by a circuit court, SADO staff attorneys obtain the lower court record and interview the inmate client. (Neuhard 6/3/85 pp. 16–17) SADO attorneys make a determination of case merit and proceed with representation accordingly.[21]

SADO also informally assists inmates. The staff reviews some 500 pieces of correspondence each month from non-client inmates. (Neuhard, 6/3/85 p. 28) This correspondence consists of requests for representation on a variety of questions concerning civil litigation matters. (Neuhard, 6/3/85 p. 29) SADO is able to respond informally to more than 400 of these non-client requests each month by providing briefs from a brief bank and newsletters on related matters. (Neuhard, 6/3/85 pp. 28–

29) SADO also refers inmates to private attorneys or a formal referral service for possible representation in potentially meritorious civil rights claims. (Neuhard, 6/3/85 p. 66)

### b. *Legislative Corrections Ombudsman*

The Office of the Legislative Corrections Ombudsman has an oversight function with respect to the Department of Corrections. Its staff monitors and investigates complaints which allege that administrative action taken by the Department of Corrections is contrary to administrative rules and policies, contrary to law, or is arbitrary or capricious. (Birch, Ombudsman and chief administrator of the Office, 11/17/87 pp. 8–9) The duties of the Office are established pursuant to M.C.L.A. Sections 4.351–364 (M.S.A. Sections 2.139(1)–2.139(14)).

The work of the Office of the Ombudsman may indirectly benefit the case of a particular inmate. Staff persons from the Office are sent to the prisons regularly to investigate, report, and make recommendations on matters which might comprise the basis of civil rights actions by inmates. (Birch, 11/17/87 pp. 8–9. *See also* Girard, 6/16/86 p. 83) The investigation and resulting information may serve to resolve the matter or may possibly be used by an inmate in presenting his claim to a court, but no direct assistance is provided.

### c. *Other Assistance Including Outside Attorneys*

The U.S. District Court for the Eastern District of Michigan has a *pro bono* attorney assignment program for inmate civil rights cases. (Defendants' exhibit 58) This program does not provide meaningful legal assistance in drafting inmates' complaints. Instead, an inmate's complaint is evaluated for merit. Frivolous or non-sufficient complaints are dismissed and no attorney is appointed. If an inmate cannot

---

**21.** Neuhard, 6/3/85 at p. 17, *et seq.* If no appealable issues are apparent after review by SADO staff attorneys, the case is dismissed with no further analysis if the client agrees. The rate of voluntary dismissals is approximately seventeen per cent. *Ibid.* No evidence indicates any situations in which SADO attorneys and their clients were in conflict as to the lack of merit of the client's case. *Ibid.* SADO does not have a policy of filing *Anders* briefs. *Ibid* at p. 18.

draft an effective complaint, he is unlikely to obtain an attorney.

Other attorneys may undertake to represent an inmate in a civil rights matter under a modified contingency fee arrangement. In all section 1983 cases, plaintiffs' counsel who prevail are entitled to a fee for all hours reasonably expended (42 U.S.C. Section 1988). The payment does not depend upon the size of any award to a plaintiff.

In addition to these direct forms of assistance for legal matters, an inmate may file a claim administratively through the Central Complex grievance process.

### C. Court–Appointed Experts' Reports

#### 1. Israel's Examination of Legal Assistance Available to Central Complex Inmates

Professor Jerold Israel of the University of Michigan Law School prepared a study primarily concentrating on the sources of legal assistance at the Central Complex.[22]

#### a. In General

Israel examined all sources of legal aid for inmates in the Central Complex. His findings and conclusions with regard to the library system and the non-library resources have been footnoted in the prior discussion where appropriate.

#### b. Nature and Extent of Assistance Rendered by PLS

In his analysis of PLS, Israel offers a detailed outline of the nature and extent of that facility's workload. This is significant in that PLS was established to service inmate requests for legal assistance. Any inquiry as to the meaningfulness of inmate access to the courts must necessarily include an evaluation of the scope of this program initiated with a goal of aiding inmates in the preparation of effective legal papers.

Because his treatment is both thorough and objective, I now draw upon Israel's work in my examination of the legal assistance actually available to Central Complex inmates through PLS.

#### (1) Categories of PLS Legal Aid

Israel first notes the broad categories by which PLS staff members classify inmate requests for legal aid. The categories are taken from a caseload log maintained by PLS. The log is used to record formal requests for assistance that come through the kite (written request) system. It does not reflect any informal or one-time questions coming through window, door or yard requests for information.

Inmate requests for legal assistance are divided into eight categories in the PLS log (roughly in the order of priority PLS would assign to the type of request):

1. Appeal of right matters;
2. Appeal of right exhausted matters (delayed appeals or delayed motions for a new trial);
3. Other post-conviction matters;
4. Prison administrative matters;
5. Other administrative matters;
6. Family law matters;
7. Other civil matters; and
8. Miscellaneous matters.

"Appeal of right" matters are those requests for legal aid by inmates who still have an appeal of right and who wish to challenge their conviction. Many of the requests in the Appeal of Right category are from inmates who already have counsel or for whom counsel might be appointed as a matter of right. Other entities outside the Central Complex have primary responsibility for assisting inmates in such matters. For example, SADO facilitates the voluntary appointment of counsel from the ranks of the state bar. (See Neuhard, 6/3/85 p. 1, et seq.) Nevertheless, PLS has taken on the task of assisting inmates in obtaining counsel in these instances. About twenty-five per cent of the inmate requests for limited assistance from PLS concern facilitating communications between the inmate and an attorney repre-

---

**22.** Israel's report is entitled "Report on the Extent of Inmate Legal Problems and Resources Available and Needed to Provide Meaningful Access to the Courts." The study also reflects the views of Professor Wolfson. See Section III, supra.

senting the inmate. (Girard, 6/5/85 pp. 266–268)

"Appeal of right exhausted" matters are requests by inmates who no longer have an appeal of right, but who wish to raise claims that can be presented to the state courts through a delayed appeal or, where the claim is outside the record, through a delayed motion for a new trial.

"Other post-conviction" matters include situations where an inmate seeks to challenge his conviction through a federal habeas corpus action.[23]

"Prison administrative" matters relate to requests regarding internal issues for the Central Complex. The administration is being questioned. Specific subjects include: (1) major misconducts or security classifications on which hearings have been or will be held; (2) complaints that may be presented through the grievance process, such as property loss or destruction, inaccurate time computations, inadequate medical treatment, etc.; and (3) any requests for assistance in parole proceedings.

The category of requests labeled "prison administrative" includes a significant number of requests for assistance on prison difficulties which could be characterized as civil rights (section 1983) suits. PLS staff members advise inmates on how to use the grievance procedure, as well as provide and assist the inmates with section 1983 complaint forms (obtained from the District Courts).[24]

As noted previously, the contract with the Department of Corrections restricts the types of cases in which PLS may offer assistance. PLS is not allowed to provide legal services with respect to "Civil Rights actions ... against the Department of Corrections." PLS does advise inmates on these matters as described above despite cautions by the Department of Corrections that such action violates the terms of the PLS contract.

Inmates also continue to seek informal assistance in challenging prison conditions. As Israel reports, "the challenging of prison conditions is among those subjects on which advice is most frequently sought." [25] (Israel, p. 33)

In his study, Israel recommends that a substantial number of the requests in the "prison administrative" matters category should be excluded in considering inmate problems for which some assistance may be necessary if, under *Bounds, infra,* assistance must be provided only for accessing the *courts.* (I will discuss provisions for assisting inmates with such matters in my examination of the grievance system in conjunction with the Wolfson study.) But, Israel also points out that the "category does include many requests for assistance on matters that are ripe for judicial action (e.g. judicial review of a misconduct finding, a possible section 1983 action on prison conditions, or a *mandamus* action to correct an erroneous time computation)." (Israel, p. 34)

"Other administrative" matters involve non-prison difficulties in areas such as de-

---

**23.** As Israel notes, there is an obvious overlap between the second and third categories. An inmate "may request habeas corpus relief, placing his request in the category of 'other post-conviction' matters, but the staff attorney in PLS may conclude that the justiciable claim must first be exhausted by presentation through a delayed appeal." (Israel, p. 27, n. 42)

Further, Israel estimates that the first three categories, those involving criminal actions, may account for as much as fifty per cent of the PLS workload. (Israel, p. 65).

**24.** The United States District Court for the Eastern District of Michigan has developed simplified forms accompanied by instructions for inmates who seek to file either 42 U.S.C. section 1983 or habeas corpus actions as well as forms to aid inmates in applying for *in forma pauperis* status. (Defendants' exhibit 30) A similar package of forms is available to inmates who ask for state circuit court review from adverse disciplinary hearing decisions. (*See* Defendants' exhibit 31).

**25.** In 1985, for example, inmates from the Central Complex filed approximately 180 lawsuits against the Department of Corrections or its employees. (Wallace, 6/24/86 pp. 27 and 37. *See also* Defendants' exhibit 34).

As a point of comparison, inmates from other complexes at SPSM, also serviced by PLS, filed an additional seventy-three suits against the Department of Corrections or its employees in 1985. (Wallace, 6/24/86 p. 38).

portation, social security and veterans' benefits, workers' compensation claims, etc.

"Family law" matters include all family or domestic issues such as divorce, termination of parental rights, custodianship, and occasionally probate matters.

"Other civil" matters describe various actions in which the inmate is sued or wishes to bring suit with regard to some civil issue not in the family law category and not related to the prison administration (i.e., tort actions based on incidents occurring prior to imprisonment or insurance claims).

"Miscellaneous" matters predominantly take the forms of requests for notarization and photocopying by prisoners who prepare their own complaints.

(2) Types of Responses Made by PLS

Any response PLS makes to one of the eight categories of inmate requests are logged as one of the following activities:

(1) limited assistance;
(2) xerox;
(3) notary;
(4) wait list (delayed assistance);
(5) denied (no assistance); and
(6) file open.

"Limited assistance" covers the majority of the legal aid offered by PLS. This response category includes a variety of services (i.e., telephone calls, assistance in writing to the courts, and other work on an inmate's case such as obtaining depositions).

"Xerox" and "notary" are self-explanatory. These responses are usually made to inmate requests on a one-time basis.

"Wait list" denotes inmate matters in which PLS desires to assist the inmate, but which do not have a high priority because of the limited resources of PLS.

"Denied" indicates a determination by PLS that the facility will not aid an inmate on a particular request.

"File open" denotes a PLS response in matters for which PLS assumes full responsibility. In these instances, PLS will prepare the papers necessary to bring the matter to resolution, but will generally not make court appearances.

(3) Summary of PLS Workload

A summary of Central Complex inmate requests and PLS responses for 1984 and 1985 is presented by Israel as follows:

### REQUESTS BY CATEGORY

| Subject | 1985 | 1984 |
|---|---|---|
| Appeal of Right | 276 | 208 |
| Appeal of Right Exhausted | 449 | 120 |
| Other Post–Conviction | 113 | 88 |
| Prison Administrative | 286 | 256 |
| Other Administrative | 35 | 35 |
| Family Law | 483 | 174 |
| Other Civil | 466 | 364 |
| Miscellaneous | 346 | 165 |
| TOTALS | 2,454 | 1,410 |

(See Israel, p. 30)

### TYPES OF ASSISTANCE RENDERED—1985 *

| Subject | Limited Assist. | Xerox, Notary | Wait List | Denied | File Open |
|---|---|---|---|---|---|
| Appeal of Right | 233 | 3 | 0 | 24 | 15 |
| Appeal of Right Exhausted | 368 | 7 | 3 | 14 | 57 |
| Other Post–Conviction | 92 | 2 | 0 | 7 | 11 |
| Prison Administrative | 213 | 73 | 0 | 7 | 2 |

| Subject | Limited Assist. | Xerox, Notary | Wait List | Denied | File Open |
|---|---|---|---|---|---|
| Other Administrative | 34 | 0 | 1 | 0 | 0 |
| Family Law | 227 | 2 | 101 | 81 | 80 |
| Other Civil | 431 | 5 | 2 | 18 | 9 |
| Miscellaneous | 149 | 190 | 0 | 7 | 0 |
| TOTALS | 1,747 | 282 | 107 | 158 | 174 |

(*See* Israel, p. 30)

\* Note: Type of assistance line totals by category do not agree with the yearly totals presented in the prior table.

### c. *Discussion of the Growth of PLS Efforts Given Limited Resources*

There has been a steady increase in the number of formal requests since 1981.[26] As Israel notes in his report:

To some extent, this "growth" factor probably reflects increased awareness of (and confidence in) the services provided by P.L.S. At this point, P.L.S. is well known and further growth on that score alone is likely to be limited. However, sudden jumps in certain years (1982 and 1985) suggest other factors also played a significant role in the increased number of requests. These may include changes in the population or changes in the service rendered by P.L.S. with respect to a particular type of case. (*Cf.* Mayhew, *Institutions of Representation, Civil Justice and the Public*, 9 Law & Society Review 401 (1975) (a legal service project that is especially equipped to handle a particular type of problem is more likely to "find" such problems).) Similar changes may result in dramatic increases in the future. The 1985 figure, presenting a substantial jump over 1984, may reflect the probable level of requests for future years, a peak from which there will be a decrease (unlikely based on past experience), or the starting point for dramatic new increases.

(Israel, p. 32)

Despite this increase in the number of requests for legal assistance and an increase in the Central Complex population, the resources available to PLS have not changed significantly over the term of the injunction. The budget for PLS has remained relatively constant. As a result, the number of persons on the staff serving inmates has tended to remain stable for the past six years. Likewise, office space and other resources have not been allowed to keep pace with increased needs. Rather than allocating more resources to PLS, the Department of Corrections has announced a continued intention to decrease the monies spent on PLS or to abolish the program completely.

PLS has responded to budget and other operating constraints by allocating its resources. The most visible aspect of this program is the prioritizing of matters on which PLS will assist inmates. The practice of assigning priorities has led to wait-listing certain inmate requests for legal aid.

The PLS procedure for wait-listing certain requests for assistance is internally justified by referencing the substantially increased caseload of PLS in the last two years. The wait-listed matters are those which would ordinarily be serviced by PLS staff, but which are not now considered part of the group of cases marked for immediate attention. Requests for assistance on family law issues are generally given the lowest priority under this system. "Immediate attention is given to emergency situations, cases involving children, and responses to actions brought against the inmate, but other family law cases (primarily inmate requests for assistance in getting a divorce) are wait-listed." (Israel, p. 32)

**26.** Israel, p. 32. For the prison as a whole, there has been an increase from 853 requests in 1981 to 3,321 in 1985. (The annual figures are: 1981–853 requests; 1982–1,406 requests; 1983–1,941 requests; 1984–1,916 requests, and 1985–3,321 requests).

Israel cautions that the statistics may not reveal the full effect of the wait-listing practices of PLS. "Although there was a substantial jump in the number of family law requests presented in 1985 (483, as compared to 173 in 1984), it is possible that increase would have been even greater if not for the wait-list[ing] practice. Some inmates may have decided against seeking assistance because they anticipated wait-listing. (Although there is far less wait-listing for other types of cases, the image of P.L.S. as an overburdened facility may also have discouraged the presentation of other requests—although the sharp jump in requests between 1984 and 1985 would suggest otherwise.)" [27]

## 2. Wolfson's Examination of the Grievance Program

### a. *Introduction*

Professor Charles Wolfson of the University of Michigan School of Social Work prepared a study on the grievance system at the Central Complex.[28]

Wolfson analyzed the existing grievance system and made recommendations for its improvement. I now draw upon his work in my examination of the Central Complex grievance program.

The Michigan Department of Corrections has developed a formal grievance policy: "Grievance Procedure for Corrections Clients." (No. DD–DWA–62.02, effective June 1, 1983) Facially this plan meets the standards established by the American Correctional Association. (*See* American Correctional Association, *Standards for Adult Correctional Institutions* (2d ed. 1981), at page 89.) According to Wolfson, the grievance policy conforms to the set standards in its requirements for a written response, time limit for that response, access to all inmates, and means for resolving questions. (Wolfson, p. 1) However, Wolfson finds that the Grievance Procedure differs from the set standards in that it does not provide for inmate and employee involvement in the design and operation of the grievance procedure. (Wolfson p. 2; *see also* 42 U.S.C. Section 1997e and 28 C.F.R. 40.1–40.10)

### b. *Description of the Central Complex Grievance Program*

The Central Complex grievance program provides two avenues of presenting grievances: a Warden's Forum for presenting grievances concerning units or the prison as a whole, and a written grievance procedure for presenting individual grievances.

#### (1) Group Grievances—Warden's Forum

The Warden's Forum is available for the presentation and hearing of group or unit grievances and prison-wide grievances. Although the Forum is not structured to handle such grievances, it appears that individual grievances are also presented.[29]

The Forum is composed of inmate representatives elected at the unit or block level. These inmates' representatives are given the responsibility of negotiating unit-level problems with the Resident Unit Manager. There are, however, no established procedures or recommendations. The Forum thus lacks structure and accountability. (Wolfson p. 7) Access to the Forum is restricted to inmates in cell blocks 5 and 6 of the Central Complex. (Wolfson, pp. 7–8)

Wolfson concludes that the Warden's Forum as it now exists cannot provide mean-

27. Israel, p. 32. Israel also observes that "in this respect, [inmates] would be in no different situation than indigent persons seeking legal assistance from many legal aid offices. Plaintiff divorce cases traditionally are given lowest priority (and commonly wait-listed, sometimes for as long as a year) by legal aid offices with heavy caseloads. (The prisoner's situation is arguably distinguishable, however, since divorce may be more significant to him in light of its possible impact on parole opportunities and the prisoner faces greater obstacles in proceeding on his own, due to his inability to appear in court.)" *Ibid.*

28. "A Study of the Grievance System at the Central Complex and Reception and Guidance Center, State Prison of Southern Michigan," March 30, 1987. Wolfson's study also reflects the views of Professor Israel. *See* Section III, *supra.*

29. The number of grievances presented at each meeting is now being limited, according to the testimony of an inmate member, Koster; the emphasis may have shifted back to more widespread problems since Wolfson reviewed the Warden's Forum program.

ingful and dependable resolution of grievances. He notes that "mechanisms for facilitating the mediation process are absent. The process is dependent upon the skills and persistence of the [inmate] representative and the level of interest, available time, and sympathies of the [prison administrator]." (Wolfson, p. 7)

### (2) Individual Grievances

For individual problems, a formal written grievance procedure is available for all inmates of the Central Complex. The individual grievance system is divided into a number of steps once a written grievance is made by an inmate.

As a practical precursor to filing a written grievance, an inmate must approach the employee involved and attempt a resolution. If the inmate is unsuccessful in this informal effort, he submits a Step I, written grievance form.

The written grievance procedure consists of three steps: the first step at which the inmate's grievance is heard and initially resolved, and two steps of appeals.

### (a) *Step I—Written Grievance Filed*

At Step I, the completed grievance forms are forwarded to the Grievance Coordinator. The Grievance Coordinator determines the most suitable staff person to respond to the grievance and forwards the grievance to that person.

Wolfson's study highlights the irony of the current procedure: the person to whom the Coordinator sends the grievance may well be the staff member about whom the inmate is complaining and with whom he has already unsuccessfully attempted a resolution. The rationale is that the person closest to the problem can best offer explanation or resolution. (Wolfson, p. 3)

The Grievance Coordinator is responsible for monitoring the staff person's response. The Grievance Coordinator also compiles and disseminates data regarding grievances and responses.[30]

The grievance program at Step I is largely controlled by the employees who are alleged to have caused the dispute with an inmate. The staff member is given great discretion in resolving the grievance with the inmate. In addition, the procedure requires the Grievance Coordinator to rely upon the staff member's good faith and energy to follow the procedure for resolving the problem: to read the grievance, seek out the inmate, discuss the matter, and explain the matter or resolve the dispute. (Wolfson, p. 3) The staff member must then file a written account of his response within fifteen days. (Wolfson, p. 3)

Wolfson concludes that Step I is efficient in gathering information regarding the grievances. Through the information compiled from the grievances, the Grievance Coordinator is in touch with the temper of the institution: he knows where and what the problems are in the Central Complex. (Wolfson, p. 3)

### (b) *Step II—First Appeal*

Step II of the grievance procedure is available to inmates who wish to appeal the result of Step I.[31] The inmate must appeal within ten days of receipt of the Step I response. The appeal goes to the Warden, Deputy Warden, or a Superintendent. At the Central Complex and R & GC, the appeal goes to the Deputy Warden, who has a grievance worker to assist him. The Warden, Deputy Warden, or Superintendent must respond to the Step II grievance within fifteen days, with fifteen-day extensions routinely granted. (Wolfson, p. 4)

Fewer than ten per cent of the grievances filed at Step I are appealed to Step II. (Wolfson, p. 4) Wolfson notes that this may represent some 200 appeals at Step II for the Central Complex in one month. (*Ibid.*)

---

**30.** Under the current grievance procedure, the Grievance Coordinator's workload is heavy. For example, during the first five months of 1986, a monthly average of 940 grievances were filed by inmates as Step I of the grievance procedure. (*See* chart—Wolfson, p. 10).

**31.** Certain categories of appeals go directly to Step III (i.e., brutality and discrimination).

### (c) *Step III—Final Appeal*

From the result at Step II, an inmate may appeal to the Office of the Director of the Department of Corrections. This procedure comprises Step III of the process.

Two persons in the Office of the Director of the Department of Corrections review appeals. The same time limitations that apply to Step II are in force at Step III. (Wolfson, p. 4)

### c. *Discussion of the Central Complex Grievance Program Given Its Current Focus*

Wolfson notes that the current grievance program suffers from its focus on information gathering rather than resolution of the inmates' complaints:

> The grievance procedure relevant to complaints of individuals is entirely bureaucratic and essentially amounts to the filing and classification of forms which funnel from step to step with minimal attention to resolving disputes or exacting remedies.

(Wolfson, p. 5)

The focus on information may contribute to the small number of grievance appeals at Step III which are not denied.[32] It is probable that the entire system is geared only to processing forms, with the overburdened decision makers at each level routinely approving the decisions of those below them.

There are no objective statistics with which to evaluate the actual number of grievances satisfactorily resolved. (Wolfson, p. 9) Wolfson was able to state positively only that the system probably provided some catharsis for inmates by committing their grievances to paper. (Wolfson, p. 9)

The grievance procedure lacks credibility in Wolfson's view. Neither inmates nor Central Complex employees believe that it will resolve their disputes. (Wolfson, p. 9) This is due largely to the lack of inmate and employee input into the formulation, implementation, and operation of the grievance procedure.[33] "It is a cynical system which ignores current knowledge and skills useful in mediating and resolving disputes." (Wolfson, p. 5)

In short, while grievances are expressed, there is no assurance that they are being heard. The current system, an information-gathering system, while enabling the prison authorities to keep in touch with the prison's problems, provides information after the fact and the resulting decisions are not timely. In a system focused on dispute resolution, timely response is the key characteristic and decisions and recommendations come from the levels of authority nearest dispute. The number of grievances with which the Grievance Coordinator must deal forces him primarily into the role of statistician.

"It is clear that the system now in place at [Central Complex] is an information processing system which serves the warden well but the prisoner grievant poorly." (Wolfson, p. 9)

In summary, Wolfson emphasized the goal of a grievance procedure. The objective is to provide a fair and prompt resolution to prisoners' legitimate complaints. To achieve this end, there must be means for inmates to present their complaints and means of assessing and responding to these complaints. In Wolfson's opinion, the Central Complex grievance system, as it currently exists and in the form it is contemplated to have in the future, does

---

**32.** In three months during 1986, of nearly 800 filings at the Step III, less than four per cent were resolved in favor of the inmate. Wolfson notes that it would be incredible that prisoners would continue to file almost 800 grievances were ninety-six per cent of them without merit. Because of the overwhelming workload, Wolfson concludes that the process at Steps I and II cannot be so painstaking that these figures reflect the lack of mistakes. (Wolfson pp. 9–10)

**33.** *See, e.g.,* the Civil Rights of Institutionalized Persons Act, codified at 42 U.S.C. sections 1997–97j, which requests states to voluntarily incorporate inmates and employees into their grievance procedure in an advisory role in formulating, implementing, and operating the grievance procedure. Section 1997e(b)(2). *See also* 28 C.F.R. 40.1–40.10 for the minimum standards promulgated under the Act.

not accomplish this goal. (Wolfson, pp. 5–6)

## V. FINDINGS OF FACT

The Central Complex provides an institution-run law library system which includes the main law library and several satellite libraries in segregated cell blocks. The library system is limited and only facially sufficient for inmates able to utilize its textual resources. The physical location and size of the library area do restrict use, but fairly generous, if not always reliable, hours of operation assist inmates in overcoming the physical plant limitations of the facilities. The arrangement of the limited collection prevents inmates from readily accessing the books. The system under which inmates utilize the library materials also precludes the availability of basic legal texts to more than one inmate at a time. Maintenance practices are not sufficient to guarantee updated or non-mutilated materials. Staffing and services procedures are not sufficient to meet inmate needs on a timely basis. The Central Complex library system does eventually allow literate inmates access to legal texts useful in preparing matters for judicial scrutiny, but cannot be said to furnish meaningful access to the courts.

Central Complex inmates who are not literate make up a substantial segment of the inmate population. At least twenty per cent of the inmates are totally illiterate and cannot read according to the results of achievement tests administered by prison officials to inmates upon entrance to the Central Complex. As many as fifty per cent of the inmates may be functionally illiterate and unable to comprehend basic, written legal resources offered in the Central Complex library system. The results of the readability analysis indicate that inmates comprehend the English language at the sixth grade level (on average). This precludes the meaningful use by Central Complex inmates of any materials written for readers beyond the sixth grade level.

The problem of functional illiteracy is compounded by indigency or near indigency for the majority of Central Complex inmates. At least 120 inmates had a balance of seven dollars or less in their prison accounts in October, 1987. Eighty-two per cent of the inmates had less than eighty dollars in their accounts for that period and were expected to pay for their basic supplies from that balance. Clearly, these 1,774 inmates (eighty-two per cent of the approximately 2,168 inmates listed in Defendants' exhibit 90 as having spendable balances) cannot afford to hire any legal assistance and must rely upon the non-library legal resources provided by the prison.

For the approximately 1,200 inmates housed in segregated cell blocks within the Central Complex (about half the inmate population is confined to segregated blocks for administrative or punitive reasons) the added burden of functional illiteracy, for those who thus cannot make use of the limited library materials permitted, is particularly onerous. Aside from a check-out procedure allowing a segregated inmate to request the use of three to five books for twenty-four hours from the main law library, confined inmates must generally make use of a satellite library in a cell block or use the extremely limited non-library legal resources permitted by the terms of their special confinement.

In general, the non-library legal resources available in the Central Complex are provided sporadically, if at all, to the inmate population. While varied in number and nature, these types of non-library legal assistance are limited in scope and effectiveness. In most instances, security or funding concerns have prevented the non-library resources from providing meaningful assistance in the preparation of complaints adequate for submission to the courts.

The head librarian and her assistant are not sources of legal assistance. They have training in library science with no particular emphasis on legal texts. Their duties do not include assisting inmates with legal research.

The inmate library clerks are not sources of legal assistance. Their training emphasizes clerical functions and does not include legal research techniques. Inmate library

clerks are primarily available to assist inmates by locating library materials. Their responsibilities do not include assisting inmates with legal research.

The personnel involved in the adult education program at the Central Complex are not sources of legal assistance and the program itself does not attempt to teach legal research techniques. Rather, the education program is intended as a remedial reading class designed to inculcate only minimal skills.

The Personal Affairs Officer is not a source of legal assistance. He will help inmates read their mail or perform similar tasks. He does not aid inmates in drafting or otherwise assist in the preparation of legal materials. His duties do not include assisting inmates with legal research.

Various inmate groups are not a source of legal assistance for inmates. The inmate organizations are primarily *ad hoc* sources of interpreters for the inmate population of the Central Complex. No formal program exists to provide translations of legal materials for inmates who do not have English as a native language. Likewise, the Central Complex provides no formal means by which a non-English speaking inmate is guaranteed assistance in legal research or drafting materials for submission to the courts.

Unreliable legal assistance is available from jailhouse lawyers in the Central Complex. At most, ten per cent of the more than one hundred inmates who have declared themselves to be jailhouse lawyers possess rudimentary legal skills. Most jailhouse lawyers learn some law by preparing their own cases or by taking one of a handful of introductory criminal law courses offered by the local community college. No formal procedure exists to monitor the quality of assistance offered by the jailhouse lawyers at the Central Complex.

The ability of an inmate to utilize the limited resources of a jailhouse lawyer is restricted by financial, security, and other constraints. A typical fee of a jailhouse lawyer commonly runs to hundreds of dollars in contravention of prison policy that

no fee may be charged. Central Complex regulations dictate that inmates are generally not free to consult with one another and segregated inmates may not confer with other inmates at all. Other security measures limit the efficacy of a jailhouse lawyer by curtailing his ability to gain additional library time to work on other inmates' matters or to possess legal materials pertaining to other inmates' cases. Population control concerns necessitate frequent transfers of inmates including jailhouse lawyers; a transfer effectively ends any involvement of a jailhouse lawyer with client inmates in his former institution.

Inmate paralegals offer no better source of legal assistance than the doubtful aid available from jailhouse lawyers. The same constraints regarding skill, security, etc., in operation for jailhouse lawyers are in force for inmate paralegals. The fact that an inmate paralegal may work in the Prison Legal Services facility does not ameliorate the basic deficiencies in the inmate paralegal's ability to offer meaningful legal assistance.

The State Appellate Defenders Office is not a source of general legal assistance for inmates of the Central Complex; the duties of the SADO staff are statutorily limited to those matters where an inmate has a right to appointed counsel. The workload of that office dictates that no further, formal help can be offered other than provision of written legal materials.

The Legislative Corrections Ombudsman's Office is not a source of legal assistance for Central Complex inmates. The Ombudsman's staff is charged with monitoring prison conditions in general. Unless the investigation and report of the Ombudsman on a particular subject are germane to an inmate's specific civil rights action, the function of that office is not useful in providing meaningful access to the courts.

Outside attorneys do take some cases for inmates in the Central Complex on a volunteer basis, but they are not sources of general legal assistance in providing meaningful access to the courts. This *pro bono* or contingency fee-based assistance is not

available with any certainty or with any guarantee of effective assistance. Generally, an inmate must draft a complaint which sufficiently states his case to interest the outside attorney or the court in appointing such an attorney. Obviously, such a program does not provide help in drafting and otherwise preparing the inmate's case for initial, meaningful consideration.

Prison Legal Services does not provide meaningful legal assistance for the inmates of the Central Complex. The equivalent of less than two attorneys must service between 2,400 and 10,000 inmates (if the transient inmate population is considered). The staff attorneys are assisted by only three or four inmate paralegals in their mammoth task. Inmate paralegals are unable to offer legal assistance of any quality. The variety of the workload, budgetary and other restraints upon independence, and the volume of inmate requests for aid also prohibit the PLS facility from providing meaningful legal assistance.

PLS is involved essentially in every matter an inmate seeks to bring to court. Inmates' pressing legal assistance needs have led to a PLS policy of general intercession on behalf of Central Complex inmates. Although PLS staff is severely limited, the facility assists inmates in post-conviction appeals as well as in administrative matters subject to the grievance procedure (but which are treated as judicial issues). Prohibited by contract from bringing actions against the Michigan Department of Corrections, PLS nevertheless assists inmates in completing forms provided by the courts to facilitate civil rights suits against the department. The PLS caseload also includes family, real estate, and other civil law matters.

The contract also limits the quality of the legal assistance PLS may provide. The Department of Corrections retains control over the operation of the facility by regulating its budget and its provision of services under the contract. Funding has remained relatively constant with a resultant decrease in the assistance which might be provided for an inmate due to an increasing prison population. The Department of Corrections has announced its intention to eliminate PLS; the service continues because of my injunction. Thus, while a Board of Trustees is appointed to oversee the functioning of PLS, actual control in large part is in the Department of Corrections.

The number of inmate matters serviced by the PLS staff also inhibits its ability to provide meaningful assistance. PLS has responsibility for inmate assistance in the entire State Prison of Southern Michigan; the Central Complex is but one of the facilities serviced. PLS responds to informal, one-time requests for information as well as formal requests by inmates for legal assistance. Because of the volume of inmate requests, certain family law and other civil law inmate cases are waitlisted for attention under a priority system which assigns highest rank to post-conviction items. These post-conviction matters comprise some twenty-five per cent of the PLS workload. No priority is given to concerns of inmates who are totally or functionally illiterate or otherwise unable to utilize the law library.

The ratio of attorneys to inmates exceeds recommended ratios and underscores the inadequacy of PLS to meet inmate legal assistance needs with any certainty. The American Bar Association recommends a ratio of one attorney to 800 inmates provided the attorneys are assisted by certified paraprofessionals. The American Corrections Association and the American Bar Association otherwise recommend a ratio of one attorney to 400 inmates. In the Central Complex, PLS has the equivalent of less than two attorneys to serve at least 2,400 inmates, or a ratio of one attorney to 1,200 inmates, and no assistance by certified paralegals.

PLS was instituted to assist inmates in preparing meaningful complaints for filing in the courts. The facility does provide assistance to the inmates it is able to service. However, the stagnant budget and program control in an environment of burgeoning growth of the inmate population prevents PLS from providing the assist-

ance necessary and sufficient to constitute meaningful access to the courts.

The Grievance Program at the Central Complex hinders the ability of those agencies and programs that provide some inmate assistance to effectively aid them in instituting matters suitable for legal review. Matters which should be resolved more effectively and efficiently within the prison system are submitted to the courts because the grievance procedure is not functioning.

Primarily viewed as an information-gathering system at best, the Central Complex grievance program consists of a series of appellate procedures within the prison bureaucracy. Inmate participation in the procedure is limited to filing grievances. Once filed, a grievance is subject to the control of the staff member who allegedly caused the underlying breach of the inmate's rights. Subsequent steps in the program provide no relief. Each level of appeal appears to result in rubber-stamping of prior reviews of the merits of an inmate's complaint.

Based on these findings of fact, I conclude that defendants do not provide meaningful access to the courts for Central Complex inmates because of the conditions of the present library system. For literate inmates, correcting the library system deficiencies would provide meaningful access to the courts. I find additionally that inmates who are illiterate (actually or functionally), indigent or nearly indigent, or in segregated confinement are unable to use a library system to meaningfully access the courts. For these inmates, correction of the library system conditions cannot provide meaningful access to the courts. I further find that the legal assistance now available to inmates in the Central Complex is not sufficient and does not constitute meaningful access to the courts.

## VI. THE LAW

Many courts are engaged in a continuing analysis of the affirmative duty of the government to provide inmates with meaningful access to the courts. There is no shortage of caselaw. It illustrates the commitment required to insure this right under the Constitution and serves as a foundation for the remedies I order.

In *Nordgren v. Milliken,* 762 F.2d 851, 853–855 (10th Cir.1985), *cert. den'd,* 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985), the United States Court of Appeals for the Tenth Circuit provides a recitation of decisions examining the right of meaningful access to the courts prior to and including the landmark case, *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *reh'd following remand, Smith v. Bounds,* 610 F.Supp. 597 (E.D.N.C.1985) (legal assistance by attorneys is required to provide meaningful access to N.C. inmates), *reconsideration den'd,* 657 F.Supp. 1322 (E.D.N.C.1985), *second order entered* 657 F.Supp. 1327 (E.D.N.C.1986), *aff'd.* 813 F.2d 1299 (4th Cir.1987), *aff'd. on rehearing en banc* 841 F.2d 77 (4th Cir. 1988) (no reconsideration of district court judgment necessary). Those decisions are informative as to the ties between essential, constitutional rights and an inmate's right to meaningfully petition the courts.

Meaningful access to the courts is a right basic to our system; it is well established as one of the fundamental rights protected by the Constitution. *Ryland v. Shapiro,* 708 F.2d 967, 971 (5th Cir.1983). The United States Court of Appeals for the Fifth Circuit notes that the Supreme Court "viewed the right of access to the courts as one of the privileges and immunities accorded citizens under article 4 of the Constitution and the fourteenth amendment." *Ryland,* 708 F.2d at 971, *ref. Chambers v. Baltimore & Ohio Railroad Co.,* 207 U.S. 142, 28 S.Ct. 34, 52 L.Ed. 143 (1907). The court in *Ryland* added: "[there is] in the first amendment a second constitutional basis for this right of access: 'Certainly the right to petition extends to all departments of Government. The right of access to the courts is indeed but one aspect of the right of petition.'" *Ibid. ref. California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). "A third constitutional basis for the right of access to the courts is found in the due process clause." *Ryland,*

708 F.2d at 972. And, in *Wolff v. McDonnell,* 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974), the Supreme Court held that "[t]he right of access to the courts, upon which [*Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) ] was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights."

In summary, the right of meaningful access to the courts "encompasses all the means [an inmate] might require to get a fair hearing from the judiciary on all charges brought against him or grievances alleged by him." *Gilmore v. Lynch,* 319 F.Supp. 105, 110 (N.D.Cal.1970), *aff'd sub nom, Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (*per curiam* ).

■ The right of an inmate to secure meaningful access to the courts was first protected in *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941) (a Michigan case involving an inmate at the State Prison of Southern Michigan). The Supreme Court held in *Hull* that "the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus." *Hull,* 312 U.S. 546, 549, 61 S.Ct. 640, 641, 85 L.Ed. 1034 (1941). *See also Johnson v. Avery,* 393 U.S. 483, 490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718 (1969). In *Wolff v. McDonnell,* 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974), the Supreme Court followed the reasoning of *Hull* and reinforced the right of meaningful access by saying that "the demarcation line between civil rights actions and habeas petitions is not always clear. The Court has already recognized instances where the same constitutional rights might be redressed under either form of relief."

In *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977), the Supreme Court established the affirmative duty of states to protect inmates' meaningful access to the courts. The Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or meaningful assistance from persons trained in the law."

■ The right of meaningful access to the courts requires that an inmate be assisted in getting his matter before a court in a form capable of remedy. That right is without substance if the inmate cannot prepare an understandable, effective complaint for a judge's consideration.

In *Wolff v. McDonnell,* 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974), the Supreme Court stated that "the Fourteenth Amendment due process claim based on access to the courts, *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), has not been extended by this Court to apply further than protecting the ability of an inmate to prepare a petition or complaint."

The Supreme Court has subsequently amplified this right by holding that the "right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers ...". *Bounds v. Smith,* 430 U.S. at 828, 97 S.Ct. at 1498. In announcing this focus, the Court recognized that "our main concern here is 'protecting the ability of an inmate to prepare a petition or complaint,' *Wolff v. McDonnell,* 418 U.S., at 576 [94 S.Ct. at 2984] ...." *Ibid.* at n. 17.[34]

---

34. *See Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458, 471 n. 4, 101 S.Ct. 2460, 2467 n. 4, 69 L.Ed.2d 158 (1981) (Stevens, J., dissenting, and citing *Bounds, supra,* stated that the Constitution has been applied to issues affecting prisoners including "right to assistance in the filing of legal papers."); *Branch v. Cole,* 686 F.2d 264, 266 n. 1 (5th Cir.1982) (*per curiam* ) (the explicit concern of *Bounds, supra* "was getting inmates through the courtroom door."); *Cruz v. Hauck,* 627 F.2d 710, 721 n. 22 (5th Cir.1980) (inmates are entitled to assistance in filing habeas corpus and civil rights actions, *ref. Bounds, supra* ); *Carter v. Kamka,* 515 F.Supp. 825, 831 (D.Md. 1980) (Legal Assistance Program met "the 'adequacy' requirement, not only in 'the preparation

The United States District Court for the Third Circuit has more recently summarized the right; attention has now focused upon the means of providing meaningful access to the courts for inmates with special needs. The Court stated:

> Courts have consistently held that the mere provision of an adequate law library does not necessarily satisfy the constitutional obligation set forth in *Bounds*. An adequate law library, by itself, cannot provide meaningful access to the courts for those inmates unable to read and understand library materials.

*United States ex rel. Para–Professional Law Clinic v. Kane*, 656 F.Supp. 1099, 1105 (E.D.Penn.1987) *aff'd. without op.* 835 F.2d 285 (3rd Cir.1987), *cert. den'd sub nom, Zimmerman v. Para–Professional Law Clinic*, —— U.S. ——, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988).[35]

The alternative to a law library, necessary to assure meaningful access to the courts for an inmate unable to use the library, has not been given a bright-line definition. Courts have been required to fashion means of meaningful access to fit the facts of each case considered. On this point, the conclusions of the court in *Stevenson v. Reed*, 391 F.Supp. 1375 (N.D. Miss.1975), *aff'd.* 530 F.2d 1207 (5th Cir. 1976), *cert. denied*, 429 U.S. 944, 97 S.Ct. 365, 50 L.Ed.2d 315 (1976) are helpful as a means of concisely illustrating the burden upon defendants:

Acknowledging that "penitentiaries include among their inmates a high percentage of persons who are totally or functionally illiterate, whose education attainments are slight, and whose intelligence is limited," the Supreme Court in *Johnson v. Avery*, 393 U.S. 483, 487, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), ... introduced a requirement of *reasonably adequate* access and placed on the state an affirmative obligation to provide ignorant prisoners with the means of intelligible communication to the judiciary to insure a fair hearing for their claims. The post-*Johnson* cases have uniformly recognized that irremediable ignorance forms a barrier to effective presentation of inmate legal claims quite as real as did the more blatant physical impediments of the past. *See e.g. Adams v. Carlson*, 488 F.2d 619 (7th Cir.1973); *United States v. Simpson*, 141 U.S.App.D.C. 8, 436 F.2d 162 (1970); *Wainwright v. Coonts*, 409 F.2d 1337 (5th Cir.1969)

We therefore conclude that the right of court access requires that the State provide *some source* of assistance for literate and illiterate inmates alike, tailored to their differing needs and abilities, which is designed to and does make realistically possible their purposeful communication with the courts.

\* \* \* \* \* \*

Acceptable legal services programs may vary widely in their format, as do the demographics of penal institutions.

and filing of meaningful legal papers', as required by *Bounds*, [*supra*] but in the entire gamut of representing DOC inmates in civil rights cases, and habeas corpus cases as well."); *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1212 (11th Cir.1981) (*en banc*) (Inmate access to the courts is not "adequate, effective and meaningful" if "it embraces no more than being permitted to file a paper that, without determination of whether it states a claim legally sufficient and within the court's jurisdiction, is subject to dismissal on grounds of convenience to courts and litigants."); and *Ward v. Kort*, 762 F.2d 856, 859 (10th Cir.1985).

35. The court in *Kane, supra*, marshals the following to support this point: "*Cruz v. Hauck*, 627 F.2d 710, 721 [ (5th Cir.1980) ] ("Library books, even if 'adequate' in number, cannot provide access to the courts for those persons

who do not speak English or who are illiterate"); *Cody v. Hillard*, 599 F.Supp. 1025, 1061 (D.S.D.1984), *aff'd* 799 F.2d 447 (8th Cir.1986), *reh'g granted*, 804 F.2d 440 ("a law library, without more, is not sufficient to enable prison inmates ... unschooled in the basics of legal writing to prepare a petition or complaint") [*aff'd and rev'd in part, en banc* 830 F.2d 912 (8th Cir.1987), *cert. den'd* —— U.S. ——, 108 S.Ct. 1078, 99 L.Ed.2d 237 (1988) ]; *Glover v. Johnson*, 478 F.Supp. 1075, 1096 (E.D.Mich.1979) (an adequate library "cannot provide meaningful aid to a prisoner unschooled in the most basic techniques of legal research"); *Canterino* [*v. Wilson* ], 562 F.Supp. [106] at 108–112 [W.D. Ken.1983] (mere access to an adequate legal library is unavailing to prisoners lacking sufficient intellectual ability to use the facility)." *Kane*, 656 F.Supp. 1099, 1105, *supra*.

But to a greater or lesser degree, dependent upon the circumstances of a particular penitentiary setting, all permissible programs must affirmatively include at least these aspects. First, some source of legal learning of a professional nature must be made available to all inmates for full legal development of their claims. Such a source may consist of an adequate law library or of qualified attorneys in sufficient number; again, some combination of books and attorneys may suffice. Secondly, for those inmates who possess intellectual or educational attainments insufficient to permit study and reasonable comphrehension of their legal claims, provision must be made to allow them to communicate with someone who, after consultation with the legal learning source, is capable of translating their complaints into an understandable presentation.

*Ibid.*, 391 F.Supp. at 1380–1382. *See also* Israel at 43 and *Glover v. Johnson,* 478 F.Supp. 1075, 1096–1098 (E.D.Mich.1979); *Canterino v. Wilson,* 562 F.Supp. 106, 111 (W.D.Ky. 1983); *Kendrick v. Bland,* 586 F.Supp. 1536, 1549 (W.D.Ky.1984); *United States ex rel. Para–Professional Law Clinic v. Kane,* 656 F.Supp. 1099, 1105 (E.D.Penn.1987) *aff'd. without op.* 835 F.2d 285 (3rd Cir.1987), *cert. den'd sub nom, Zimmerman v. Para–Professional Law Clinic,* — U.S. —, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988); and *Knop v. Johnson,* 667 F.Supp. 467 (W.D.Mich.1987). Thus the court in *Stevenson, supra,* highlights the obvious; a state must provide reliable and sufficient assistance in utilizing legal resource materials in order to be deemed to furnish meaningful access to the courts for totally or functionally illiterate inmates.

Recent decisions finding that law libraries provide meaningful access to the courts have ignored the second, common-sense aspect of the holding in *Stevenson v. Reed, supra;* no examination was made of the inability of functionally illiterate inmates to utilize the library in meaningfully accessing the courts. Both *DuPont v. Saunders,* 800 F.2d 8 (1st Cir.1986) and *Cepulonis V. Fair,* 732 F.2d 1 (1st Cir. 1984), relied upon by defendants, fail to address whether mere provision of an adequate law library provides functionally illiterate inmates with meaningful access to the courts. *Campbell v. Miller,* 787 F.2d 217 (7th Cir.1986) *cert. den'd,* — U.S. —, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986) (likewise cited by defendants) did not consider whether the appellant lacked the capacity to use a law library.

These cases are but recent examples of the tendencies of many courts to look at only part of the issue in determining the sufficiency of inmates' access to the courts. The decision in *Stevenson v. Reed, supra,* clearly illustrates the inadequacy of such an approach; significant numbers of a prison's inmates are deprived of meaningful access to the courts if a law library is automatically deemed sufficient to satisfy the *Bounds, supra,* duty to assist inmates in the preparation of legal papers.

Judge Scott concluded in *Hooks v. Wainwright,* 536 F.Supp. 1330 (M.D.Fla.1982), "no plan utilizing libraries alone could assure meaningful access to the courts, and ... defendants [must] provide 'assistance of counsel, in some form.' *Ibid.* at 1349" (*as cited in United States ex rel. Para–Professional Law Clinic v. Kane,* 656 F.Supp. 1099, 1105 (E.D.Penn.1987) *aff'd. without op.* 835 F.2d 285 (3rd Cir.1987), *cert. den'd sub nom, Zimmerman v. Para–Professional Law Clinic,* — U.S. —, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988)). The United States Court of Appeals for the Eleventh Circuit reversed Judge Scott's decision on the grounds that *Bounds, supra,* does not require a state to necessarily provide only the aid of legal counsel in a program designed to assure inmates meaningful access to the courts if other, sufficient sources of legal aid are available to answer a particular inmate need. *Hooks v. Wainwright,* 775 F.2d 1433 (11th Cir.1985), *cert. den'd* 479 U.S. 913, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986).

Strikingly, the United States Court of Appeals for the Fourth Circuit, in which *Bounds, supra,* originated, does not agree with the decision in *Hooks v. Wainwright, supra.* When the Supreme Court set the standard for meaningful access, it also sent

the *Bounds* case back to the district court on remand. District Judge Dupree was to oversee the implementation of a plan by which law libraries and assistance by inmates trained as paralegals were to be provided to North Carolina inmates. *Bounds, supra.*

The failure of the North Carolina Department of Corrections to actually provide meaningful access to the courts despite furnishing law libraries and some other aid by inmates led Judge Dupree to order the provision of *attorneys* as necessary to meet the requirements established by the Supreme Court in *Bounds, supra. Smith v. Bounds,* 610 F.Supp. 597 (E.D.N.C.1985), *reconsideration den'd,* 657 F.Supp. 1322 (E.D.N.C.1985), *second order entered* 657 F.Supp. 1327 (E.D.N.C.1986), *aff'd.* 813 F.2d 1299 (4th Cir.1987), *aff'd. on rehearing en banc* 841 F.2d 77 (4th Cir.1988) (no reconsideration of district court judgment necessary). As of the date of this writing, it appears that *certiorari* has not been sought.

Judge Dupree determined that the North Carolina Department of Corrections was constitutionally required to furnish some form of legal services for inmates which would provide inmates with the assistance of licensed counsel in *Smith v. Bounds,* 610 F.Supp. 597 (E.D.N.C.1985), *reconsideration den'd,* 657 F.Supp. 1322 (E.D.N.C. 1985), *second order entered* 657 F.Supp. 1327 (E.D.N.C.1986), *aff'd.* 813 F.2d 1299 (4th Cir.1987), *aff'd. on rehearing en banc* 841 F.2d 77 (4th Cir.1988) (no reconsideration of district court judgment necessary). The state was ordered to provide attorneys in view of findings that inmate paralegals did not provide their fellow inmates adequate legal assistance, that a high degree of illiteracy among the inmates made it virtually impossible for them to conduct meaningful legal research, and that certain segregated inmates did not have sufficient physical access to a law library to meet their legitimate legal research needs. *Ibid.*

■ Thus, in fact situations demonstrating deficiencies in a state's plan for providing inmates with meaningful access to the courts, the state has an obligation to furnish those inmates with effective legal assistance including the aid of counsel. *Ibid.* The standard established by the Supreme Court in *Bounds, supra,* has been applied to the facts upon which it arose and has been held to require the provision of attorneys to assist those inmates who are unable to utilize the law libraries provided by a prison. *Ibid.* Clearly, as the further proceedings in *Bounds* illustrate, mere provision of a law library does not automatically satisfy the standards set in *Bounds, supra,* for all inmates.

■ Finally, it is obvious that state governments cannot necessarily discharge their duty to provide meaningful access to the courts for all inmates regardless of literacy, indigency, or segregated status by providing the dubious assistance of other inmates in whatever capacity.

Courts have been reluctant to place any reliance on the work of inmates purporting to possess legal expertise. One judge aptly summarized:

> This Court's experience with veteran writwriters has typically been that, while their petitions generally look nicer and read better than those prepared by most inmates, their legal reasoning remains convoluted and even nonsensical. The conclusions they draw from stated facts are often non sequiturs. The fact that their petitions are usually typed and their legal citations approach a recognizable form does not alter the foundational defect inhering in most of the petitions— the content!

*Hooks v. Wainwright,* 536 F.Supp. 1330, 1348 (M.D.Fla.1982) *rev'd. as to required provision of attorneys* 775 F.2d 1433 (11th Cir.1985), *cert. den'd,* 479 U.S. 913, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986). *See also Knop v. Johnson,* 667 F.Supp. 467, 488–489 (W.D.Mich.1987). *But see Battle v. Anderson,* 614 F.2d 251, 255–256 (10th Cir. 1980) (a law library combined with writ writers and inmate clerks may suffice under *Bounds, supra* ).

In addition to their unverifiable and often inadequate skills as jailhouse lawyers, inmate paralegals, etc., the fees inmates

charge for services to other inmates as well as the interests of prison security in prohibiting inmates from consulting privately with one another, preclude inmates from serving as necessary and sufficient sources of legal assistance. *See Knop v. Johnson,* 667 F.Supp. 467, (W.D.Mich.1987).

## VII. CONCLUSIONS OF LAW

■ As a matter of law, the main law library for the Central Complex is only facially sufficient for those able to utilize its resources. The physical location and size of the library restrict use. The arrangement of materials prevents inmates from readily accessing resources. The system under which inmates utilize the library materials precludes the availability of certain items to more than one inmate at a time. Maintenance practices are not sufficient to guarantee the availability of current or updated materials. Staffing and services procedures are not adequate to meet inmate needs on a timely basis.

As a matter of law, the law library system at the Central Complex is incapable of meeting the standard enunciated in *Stevenson v. Reed, supra,* for all inmates.

In addition, I agree with the holding of the court in *United States ex rel. Para–Professional Law Clinic v. Kane,* 656 F.Supp. 1099, 1104 (E.D.Penn.1987) *aff'd. without op.* 835 F.2d 285 (3rd Cir.1987), *cert. den'd sub nom, Zimmerman v. Para–Professional Law Clinic,* — U.S. ——, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988), as I also conclude that because the law library system at the Central Complex "is unavailable to prisoners in administrative or disciplinary custody, and is useless to those who are functionally illiterate, the library [system] is totally ineffectual to preserve the fundamental right of [meaningful] access to the courts of these prisoners." *Ibid.* at p. 1104.

■ Even if they had the time and inclination, the staff of the Central Complex library cannot furnish meaningful assistance for functionally illiterate inmates seeking access to the courts. The head librarian and her assistant are not sufficiently trained in legal research techniques

and not expected to be. Inmate clerks are likewise unschooled and unskilled. Job descriptions for these positions do not allow for assisting inmates in the preparation of legal matters. The library staff has its hands full keeping the library functioning at the limited level of services now available. As a matter of law, the state cannot rely on the library staff to meet the duty to insure inmates meaningful access to the courts. *See Knop v. Johnson,* 685 F.Supp. 636, 640 (W.D. Mich.1988). *See also Wade v. Kane,* 448 F.Supp. 678 (E.D.Penn.1978), *aff'd. without op. sub nom. Wade v. Kane,* 591 F.2d 1338 (3rd Cir.1979), *later proceeding United States ex rel. Para–Professional Law Clinic v. Kane,* 656 F.Supp. 1099 (E.D.Penn.1987) *aff'd. without op.* 835 F.2d 285 (3rd Cir.1987) *cert. den'd sub nom., Zimmerman v. Para–Professional Law Clinic,* — U.S. ——, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988) *later proceeding* slip op. [available on WESTLAW, 1988 WL 52099] 1988 U.S. Dist. LEXIS 4493 (E.D.Pa.1988); *Knop v. Johnson,* 667 F.Supp. 467, 488 (W.D.Mich.1987); and *Kendrick v. Bland,* 586 F.Supp. 1536 (W.D.Ky.1984).

■ In *Knop,* Judge Enslen held: "the often-fabled jailhouse lawyers or writ-writers are, at least in the Michigan system, too few and often too uninformed to provide adequate assistance to the inmates." *Knop v. Johnson,* 667 F.Supp. 467, 488 (W.D.Mich.1987). Defendants have sought unsuccessfully to monitor and control the activities of jailhouse lawyers as the non-enforceable nature of its "no-charge" policy indicates. Without the means to insure the quality and quantity of services offered by jailhouse lawyers, defendants cannot insist that their duty to provide meaningful access to the courts is met by the presence of jailhouse lawyers in the Central Complex. (In fact, even the continuing availability of jailhouse lawyers is questionable. In *Knop v. Johnson,* 685 F.Supp. 636, 641 (W.D.Mich.1988), the court notes that the Department of Corrections has proposed abolishing inmate practitioners in other Michigan prison facilities.)

The fact that an inmate may have to pay a relatively high fee to a jailhouse lawyer

in return for services of uncertain quality further reduces the value of the "inmate lawyers" as a means by which an inmate might secure meaningful access to the courts. An indigent inmate would not have the means to hire a jailhouse lawyer and should not have that burden thrust upon his constitutional right to meaningful access.

Segregated confinement likewise denies an inmate the opportunity to use the services of a jailhouse lawyer. The status of segregation holds an inmate apart from other inmates. As a matter of law, another inmate may not provide meaningful access to the courts for an inmate housed in the segregated cell blocks of the Central Complex.

For these reasons, any availability of jailhouse lawyers in the Central Complex is not enough to discharge the duty of defendants to furnish inmates meaningful access to the courts.

■ As essential equivalents to jailhouse lawyers, inmate paralegals cannot afford their fellow inmates any greater hope of meaningful access to the courts under the present system. Inmate paralegals can service only general population inmates in the Central Complex. Inmate paralegals cannot consistently offer legal assistance of any quality to insure an inmate's ability to exercise his rights to reach the courts. As a matter of law, the state may not meet its burden by providing inmate paralegals who are not graduates of a qualified training program or otherwise certified as being competent to provide legal assistance. As a matter of law, even if certified as paralegals, inmates cannot be effective sources of legal assistance for those they cannot consult with in segregated confinement.

■ As a matter of law, outside agencies such as SADO or the Legislative Ombudsman's Office cannot assist in preserving the constitutional promise of meaningful access to the courts for the inmates of the Central Complex. The role of SADO is too specific and the role of the Ombudsman too general. Neither SADO nor the Ombudsman's Office can offer direct assistance to inmates seeking meaningful access to the courts on civil matters.

■ Attorneys outside the Central Complex are available on a *pro bono* or contingency fee-basis only sporadically. Prison authorities cannot guarantee the provision of any legal assistance in this manner. I find that a constitutional right cannot be adequately protected on such a basis. Rather, the interest of an outside attorney in an inmate's situation must be viewed as a bonus, if it is present at all.

■ The Grievance Program does not provide effective administrative remedies for inmates. The procedure cannot be offered as a serious source of assistance in bringing an adequately prepared record before a court on an inmate's complaint.

■ As a matter of law, the adult education programs and similar tutorial aid offered in the Central Complex cannot constitute provision of the effective assistance necessary for an inmate's meaningful access to the courts. Judge Lord noted in *United States ex rel. Para–Professional Law Clinic v. Kane*, 656 F.Supp. 1099 (E.D.Penn.1987) *aff'd. without op.* 835 F.2d 285 (3rd Cir.1987), *cert. den'd sub nom, Zimmerman v. Para–Professional Law Clinic,* — U.S. ——, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988), "[t]he prison is to be commended for providing a variety of educational programs. However, effectively denying a functionally illiterate inmate meaningful access to the courts until he completes a remedial education program is simply not acceptable." 656 F.Supp. 1099 at 1106.

■ In its present posture, Prison Legal Services cannot provide legal assistance to inmates who are functionally illiterate or who are indigent or who are segregated. The constraints upon the operation of PLS prevent consistent and competent assistance to inmates. PLS is able to help some inmates, but it cannot assure meaningful access to the courts for inmates unable to read the materials in the law library and, therefore, unable to draft their own complaints.

## VIII. REMEDY

### A. *Introduction*

PLS is the most consistent supplier of qualified legal assistance to inmates. As my injunction requiring its continued operation indicates, I find PLS to be necessary to provide meaningful access to the courts to Central Complex inmates.

A remedy mandating the assistance of PLS to inmates has merit for several reasons. First, an existing entity trusted by inmates is retained. Second, security and discipline interests of prison officials are less likely to be impinged upon by enlarging the role of an entity already a part of the system. Third, the record of PLS is a strong foundation for continuing legal assistance to inmates and thus provision of meaningful access to the courts.

Utilization of PLS, a program already in place, as a primary part of the proposed remedy imposes the "least intrusive remedy available." *Kendrick v. Bland,* 740 F.2d 432, 438 (6th Cir.1984).

PLS is also the agency best able to completely fulfill the needs of inmates seeking meaningful access to the courts which includes access for inmates filing civil rights claims. An area of particular concern to this court is provision of effective assistance in matters where Central Complex inmates seek to bring an action against the Department of Corrections.

██ Having served as chief judge of this court and as a federal district judge for nearly eighteen years, I have observed firsthand the inadequacies of a program providing only *pro bono* assistance for inmates filing civil rights claims. Furnishing counsel on a volunteer basis cannot consistently and adequately protect the civil rights of inmates. *See also Giarratano v. Murray,* 847 F.2d 1118, 1120 *et seq.* (4th Cir. 1988) (*en banc*).

The increasing numbers of *pro se* filings for alleged civil rights violations within the Michigan prison system underscores the inability of the private bar to render meaningful legal assistance to inmates in such matters. There are a number of obvious problems under the current program. The attorneys who work under the *pro bono* system are not on the scene and often cannot understand the context in which a civil rights claim arises within a prison. Most of the available pool of lawyers practice in the Detroit area. The length of travel necessitates the use of a telephone in trying to assemble a case. However, conditions of confinement and general operating principles of the Central Complex prevent effective consultations over the telephone. Often firms must utilize their least trained professionals in *pro bono* matters. Firms perceive their senior attorneys as being too valuable to become embroiled in protracted litigation against the Department of Corrections or other state agencies. For these reasons, the appointment of attorneys acting as *pro bono* counsel to inmates in civil rights actions against the Department of Corrections or its employees does not provide meaningful access to the courts in many cases.

██ Meaningful access to the courts must include a program by which inmates are able to obtain effective legal assistance in civil rights actions. (*See, for example,* related discussion in "Appropriateness of Justice Department Advocacy to Enforce Federal Rights of the Institutionalized," *1980 U.S. Code Cong. & Admin. News,* 787, 803 *et seq.,* regarding the Civil Rights of Institutionalized Persons Act, 42 U.S.C. Section 1997 (1982)). Such access requires skilled assistance which is consistently available and not subject to the conflicting time constraints of a legal practice far from the Central Complex.

As an on-site facility, PLS has an ability to assist inmates without disrupting the operations of the Central Complex. Any assistance PLS renders with regard to actions against the Department of Corrections may not be preemptorily challenged on grounds of prison security and discipline.

> [P]rison officials may not restrict the scope of inmates' constitutional rights by making automatic and conclusory assertions of discipline and security in the support of restrictive policies. *Cleaving-*

*er v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 504, 88 L.Ed.2d 507 (1985).

*United States ex rel. Para–Professional Law Clinic v. Kane,* 656 F.Supp. 1099, 1107 (E.D.Penn.1987) *aff'd. without op.* 835 F.2d 285 (3rd Cir.1987), *cert. den'd sub nom, Zimmerman v. Para–Professional Law Clinic,* —— U.S. ——, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988). *See also Knop v. Johnson,* 685 F.Supp. 636, 637 (W.D.Mich. 1988); *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Kendrick v. Bland,* 740 F.2d 432, 437 (6th Cir.1984); and *Ruiz v. Estelle,* 679 F.2d 1115, 1145–1146 (5th Cir.1982), *cert. den'd,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

I therefore find that PLS should be authorized to take up civil rights cases against the Department of Corrections.

Several states, including New York, now contract with legal services agencies to provide assistance to inmates who require aid in civil rights as well as other legal matters.[36] The availability of models for similar services will enable the Department of Corrections to implement a program of qualified legal assistance more efficiently and more quickly through PLS as PLS is utilized in a modification of its current contract status.

▮ The right to petition the courts must include most legal actions involving inmates. Incarceration deprives an inmate of the ability to control his time and efforts. Persons outside the prison may freely initiate actions or allow statutes of limitation to run against the inmate. The fact of the inmate's separation from society must act to hamper his attempts to keep abreast of the actions of others not so confined. An inmate housed in the Central Complex is further constrained by the lack of meaningful access to the courts. Without effective assistance in preparing legal papers, an inmate may be fatally disadvan-

taged in actions where other parties are far more able to maneuver. He can neither discover legal problems as they arise nor take timely action to resolve such problems once he knows of them.

For these reasons, based on the facts and conclusions of this opinion, I find that PLS should continue to represent inmates in civil matters where an inmate (1) is a defendant; (2) did not initiate the action; and (3) where an inmate's rights will expire absent timely initiation of suit, as well as in matters questioning conditions of confinement (i.e., habeas corpus or civil rights actions). *See e.g.,* the Model Sentencing and Corrections Act, *Uniform Laws Annotated,* Volume 10 (special pamphlet) at section 4–108; Israel, pp. 1–8; and Plaintiffs' exhibit 40.

I order the following components of a program for the continued, improved provision of legal assistance by PLS. As part of the remedy, I draw from the recommendations of the two court-appointed experts, Professors Israel and Wolfson. The experts' insights regarding the grievance procedures are particularly valuable in fashioning an efficient, effective means of providing inmates meaningful access to the courts. Inmate complaints which should reference administrative resolutions are now being brought for judicial review. An adequate grievance program would present a more appropriate forum for disposition of those complaints while lifting an inappropriate burden from the courts.

### B. *Remedy Provisions*

#### 1. Library System

▮ Defendants are hereby ordered to provide Central Complex inmates with a constitutionally-sufficient law library. The law library shall be maintained in accordance with the *Hadix* consent judgment. The deficiencies noted in the findings of fact are to be remedied forthwith. Further, inmates must be allowed to consult with one another if necessary in preparing

---

**36.** States which provide legal assistance by contract (or other funding arrangements) with services utilizing attorneys and/or paraprofessionals are Connecticut, Florida, Kansas, Kentucky, Maryland, Massachusetts, Minnesota, New York, North Carolina, Pennsylvania, Vermont, and Washington (pursuant to statutory and/or administrative authority.) *See, e.g., Corgain v. Miller,* 708 F.2d 1241, 1249, n. 8 and n. 9 (7th Cir.1983).

legal papers. Personnel shall be adequate in number and sufficiently trained to furnish inmates effective service in obtaining legal texts from the law library. These measures are necessary to provide a law library which is usable by Central Complex inmates.

## 2. PLS

■ The provision of legal assistance by PLS sufficient to assure Central Complex inmates meaningful access to the courts shall be set forth in a contract negotiated between PLS and the Department of Corrections and subject to comment by plaintiff class and review by this court.

The contract shall provide for and incorporate, at a minimum, the following:

a. Services provided by PLS shall be in accordance with the consent judgment and opinions of this court issued as part of the *Hadix* litigation.

b. Services provided pursuant to the contract terms are in no way intended as substitutes for existing programs by which inmates may obtain legal counsel (i.e., any *pro bono* representation, etc.) and should not diminish those programs.

c. Operational and administrative control and responsibility is vested in the Board of Trustees of Prison Legal Services of Michigan, Inc.

d. The members of the Board shall have responsibility for insuring the independent operation of PLS in providing effective legal assistance to qualified inmates.

e. The Board shall hire a Program Director licensed to practice law in Michigan.

f. The Department shall provide the necessary funding for PLS activities.

g. PLS shall provide the necessary staff, office space, supplies, and equipment to carry out the terms of the contract.

h. Minimum PLS staff levels are those necessary to achieve effective attorney to inmate ratios (i.e., one attorney per 800 inmates as recommended by the ABA, etc.) provided the services of cer-

tified paralegals are also utilized and shall include at least:
(1) One Program Director;
(2) Four Staff Attorneys; *
(3) Six certified paralegals; and
(4) Necessary auxiliary staff (i.e., one secretary to assist the Program Director).

* The number of inmates in the Central Complex varies; testimony indicated a transient population of nearly 10,000 inmates each year. Staff attorneys must be provided to serve the needs of inmates numbering between 2,400 and 10,000. Hence, I order provision of at least four attorneys.

i. Paraprofessional assistance must be under the direct, on-site supervision of experienced attorneys. "On-site supervision" occurs when the supervising attorney has direct contact with supervised persons at least three times per week. All paraprofessionals must have completed a course of training permitting certification or licensure before providing legal assistance through PLS.

j. Professional standards must be maintained in all provisions of legal assistance.

k. To assist PLS in the assessment and acceptance of case activities, the following general priorities will be used in screening new requests from inmates for legal assistance:
(1) Habeas corpus petitions;
(2) Civil rights claims including those challenging conditions of confinement; and
(3) Other civil claims involving matters such as domestic relations, personal injury, deportation, workers' compensation, social security, detainer, wills and estates, and taxation.

l. Within the general priority categories, specific case priorities may be set by PLS and reviewed annually.

m. The term of the contract shall not be less than five years with appropriate provision for renewal thereafter.

A legal services contract, used in the state of Washington, has been reviewed by the court. It is a comprehensive document making provision for many of the concerns

at issue in *Hadix.* Because the contract might be of guidance to PLS and the Department of Corrections in formulating their own agreement, the document utilized in Washington (*see* note 36, *supra* ) is included, in full, as Appendix A to this opinion. (Because defendants have objected to the use of this material in a motion pending before the court, I note that the Washington contract is included only as an informative example. The Washington contract is in no way related to the findings of fact and conclusions of law presented in this opinion and has had no effect on the determination of the ultimate issues in *Hadix.*)

While this opinion affects the Central Complex, practical considerations suggest that PLS and the Department of Corrections make provision for a state-wide application of the programs implemented as part of the remedy for the Central Complex. Thus, although the principles enunciated in *Hadix* apply to Central Complex inmates, the means by which PLS provides meaningful access might be re-structured to apply to the entire inmate population committed to the custody of the Department of Corrections. For example, PLS may be responsible for an inmate's legal matters even upon the inmate's transfer to another prison facility. Problems could be avoided by a systemwide program of providing meaningful access to the courts.

Should there be any inconsistency between this opinion in *Hadix* and the opinion of Judge Richard Enslen in *Knop v. Johnson,* 685 F.Supp. 636 (W.D.Mich.1988) and accompanying order, as they relate to meaningful access to the courts for inmates at the State Prison of Southern Michigan, joint motions should be filed before the courts to resolve any difficulties. Section IV (pages 323–27) of the *Knop v. Johnson* order pertaining to meaningful access to the courts is included as Appendix B to this opinion.

To the extent that the recently developed record in *Knop v. Johnson, supra,* presents a more current view of conditions in the State Prison for Southern Michigan than that developed in *Hadix,* I take judicial notice of the proofs in *Knop v. John-*son, supra, relating to the Central Complex and PLS. *See Detroit Audubon Society v. City of Detroit,* No. 87–71577, slip op., (E.D.Mich. February 24, 1988); *United States v. Author Services, Inc.,* 804 F.2d 1520 (9th Cir.1986); *MacMillan Bloedel Ltd. v. Flintkote Co.,* 760 F.2d 580 (5th Cir.1985); *Green v. Warden, U.S. Penitentiary,* 699 F.2d 364 (7th Cir.1983), *cert. den'd,* 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983); and *St. Louis Baptist Temple v. F.D.I.C.,* 605 F.2d 1169 (10th Cir.1979). Any differences in the operations of the Central Complex notable between *Hadix* and *Knop* have not diminished the need for the provision of legal assistance as meaningful access the courts as I order herein and I do not consider any such differences significant.

### 3. Grievance Program

■ Any remedy with respect to an inmate's meaningful access to the courts is incomplete if inmates cannot also make use of an administrative forum for administrative concerns. Legislatures as well as courts have recognized the need for non-judicial relief in appropriate situations. Congress lent its support to effective inmate grievance programs in the Civil Rights of Institutionalized Persons Act, codified at 42 U.S.C. section 1997. Congress sought to "encourage resolution of problems by the persons involved in prison administration," and noted that "[t]his should help to develop a sensitivity that may have been otherwise lacking." *1980 U.S.Code Cong. & Admin.News,* 787, 816. The experiences I have had as a judge make me agree that an effective grievance program is a necessary tool for protecting the rights of inmates and for reducing backlogs on court dockets.

The two court-appointed experts found that the current grievance program is ineffective and unresponsive to the needs of both the inmates and the Central Complex administration. I agree. The chief flaws of the present system are a lack of means for inmate participation and a lack of means for adequate, objective review of the incredible number of grievances. The remedy ordered is intended to rectify these

deficiencies without unduly disrupting the functions of the grievance program.

First, I adopt as objectives the provisions of minimum grievance program standards promulgated by the United States Attorney General under 42 U.S.C. section 1997e with emphasis on:

a. inmate and employee participation, 28 C.F.R. 40.7(b) (7–1–87);

b. investigation and consideration, 28 C.F.R. 40.7(c) (7–1–87); and

c. review, 28 C.F.R. 40.7(f) (7–1–87).

Pursuant to these standards, inmates and employees must participate in the grievance procedure in an advisory capacity. They may exercise this advisory role in the disposition of grievances and in the review of the effectiveness and credibility of the grievance procedure.

However, no inmate or employee who is involved in a grievance may participate in any capacity in the resolution of that grievance.

An inmate is entitled to a review of the disposition of his grievance which is independent of the Central Complex administration under the standards. Specifically, an inmate may request "review by a person or other entity, not under the institution's supervision or control, of the disposition of all grievances, including alleged reprisals by an employee against an inmate." 28 C.F.R. 40.7(f) (7–1–87).

Second, I order the Department of Corrections to draft policy directives to accomplish these objectives by the following means:

a. inmate participation in the Warden's Forum shall include provisions for inmate review of the grievance program and for an advisory role for inmates in the modification and operation of the grievance program;

b. inmate participation in the grievance program must include, by representation, the entire inmate population of the Central Complex; and

c. provision shall be made for employee participation in the grievance program in an advisory role similar to that afforded inmates.

Third, while an inmate and an employee may seek informal resolution of a grievance, as under the current program, the parties to a grievance shall not be responsible for its resolution once a formal complaint is made.

Fourth, the following steps shall constitute the grievance procedure:

a. filing of written grievance;

b. investigation of grievance by a grievance investigator;

c. mediation between the parties to a grievance as moderated by a grievance investigator;

d. hearing by a grievance panel if mediation fails to resolve the matter—the results of the steps below shall be presented to the panel in writing by the grievance investigator;

e. any appeals as under the present system (as modified to comply with the objectives stated in the minimum standards promulgated at 28 C.F.R. 40.1–40.10), but using the record produced by the grievance investigators and the grievance panels.

Fifth, the Department of Corrections shall implement personnel changes as recommended by Professor Wolfson in his study. This will insure more adequate staffing with resultant timely and comprehensive investigations of grievances constituting the first step in the grievance process. Specifically, the Department of Corrections shall provide qualified persons to serve as:

a. grievance investigators whose tasks shall include interviewing inmates and employees involved in a particular grievance, mediation attempts with the grievance parties, and the preparation of a written record for use in a grievance hearing should mediation fail;

b. members of grievance panels composed of staff, inmates, or others the Department of Corrections may elect to hear grievances now resolved by

individual staff members;[37]

c. grievance coordinators, independent of the Department of Corrections, to oversee the work of the grievance investigators and the grievance panels and to insure that for all grievances at the Central Complex, the investigation, attempted mediation, and any hearing are completed in a timely fashion and under uniform applications of the policies of the Department of Corrections;[38]

d. other personnel as necessary for the objectives.

Sixth, the Department of Corrections shall provide training in investigation and mediation techniques for persons involved in the grievance process.

Seventh, the grievance coordinators shall provide a yearly report evaluating the performance of the grievance system for the Department of Corrections subject to comment by plaintiff class and review by this court.

Eighth, the Department of Corrections shall commission a periodic review of the grievance system at the Central Complex by an outside body. The results of this review shall be made available to the plaintiff class for comment. The Department of Corrections shall then submit the review results, any comments by plaintiff class, and any rebuttal by the Department to this court for review. This periodic evaluation might be accomplished by an agency such as the Office of the Legislative Corrections Ombudsman.

These modifications of the present grievance system are minimal but necessary if the system is to achieve its objectives. Accordingly, the Department of Corrections is to implement immediately a program enabling compliance with this order. Appropriate policies and procedures are to be drafted forthwith. Staff and supporting regulations are to be added as necessary

following the provision of personnel and policies sufficient to accomplish the initial implementation.

4. Implementation Procedure

I hereby direct the parties and PLS to meet within a period of ninety (90) days of the date of this opinion and order to complete the contract(s) and program(s) necessary to implement these orders and to report on the status of that implementation.

## IX. CONCLUSION

A guarantee is "something that ensures a particular outcome or condition" or "a promise or assurance." *See The American Heritage Dictionary,* 2d College Edition (Houghton Mifflin Co., Boston, 1982). An inmate's right to meaningful access to the courts is guaranteed under the Constitution with unequivocal clarity in *Bounds v. Smith, supra.* Yet, in 1988, nearly ten years after the Supreme Court's decision in *Bounds,* the Central Complex does not guarantee that all its inmates have meaningful access to the courts.

Accordingly, my orders to remedy deficiencies in the provision of meaningful access to the courts and effective resolution of grievances are to be implemented with all due speed and care.

This opinion constitutes the court's finding of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

## APPENDIX A

Contract No. CDOP1162

Amendment No. 1

AMENDMENT TO THE CONTRACT AGREEMENT BETWEEN THE STATE OF WASHINGTON DEPARTMENT OF CORRECTIONS AND EVERGREEN LEGAL SERVICES

PURPOSE OF CHANGE: To amend that Contract Agreement entered into the 1st

---

**37.** For example, committees composed of both inmates and staff are used in New York. G. Cole & J. Gilbert, *Alternative Dispute–Resolution Mechanisms for Prisoner Grievances,* 9 The Justice System Journal 317 (1984).

**38.** Wolfson states that locating personnel in the Bureau of Health Care rather than within the Bureau of Correctional Facilities would offer advantages with regard to emphasis of concern, independence, etc. (Wolfson, p. 16)

day of July 1985, by and between the Department of Corrections of the state of Washington and Evergreen Legal Services, and to make other necessary changes within the scope of the Contract Agreement.

The above-referenced Contract Agreement identified herein as Contract No. CDOP1162 is hereby amended as set forth below pursuant to the *Changes and Modifications* clause contained in Exhibit B, *General Terms and Conditions*, to Contract No. CDOP1162.

1. All citations referring generally to the Code of Professional Responsibility (CPR) contained in Contract No. CDOP1162 shall henceforth, where appropriate, be considered to refer to the Rules of Professional Conduct (RPC) as adopted by the State Supreme Court.

2. Article VI, DISCLOSURE, is amended to include reference to RPC 1.6 and to delete reference of DR4–101(C)(3) of the Code of Professional Responsibility.

3. The second sentence of Article XII, CONFLICTING EMPLOYMENT, which reads as follows:

 "DR5–105(a) of the CPR states that a lawyer shall decline proferred employment if the exercise of his/her independent professional judgment on behalf of a client will or is likely to be adversely affected by acceptance of such employment."

 is deleted in its entirety.

4. All citations to DR2–110 of the CPR contained in subsections 3.2 and 3.3 of Exhibit A to Contract No. CDOP1162, shall henceforth refer to RPC 1.15.

5. All other terms and conditions of Contract No. CDOP1162 shall remain in full force and effect.

6. The changes set forth in this Amendment to Contract No. CDOP1162 shall become effective on the 1st day of September 1985.

IN WITNESS WHEREOF, the below-named have affixed their signatures in execution thereof.

STATE OF WASHINGTON
DEPARTMENT OF CORRECTIONS
APPROVED AS TO BINDING EFFECT:
(s)Robert E. Trimble 8/29/85
for Secretary, Amos E. Reed_____Date
APPROVED AS TO FORM:
[signature illegible]
AAG for DOC_____Date

————

Contract No. CDOP1162
CONTRACT AGREEMENT

THIS CONTRACT AGREEMENT, made and entered into this 1st day of July 1985, by and between the Department of Corrections of the state of Washington, hereinafter referred to as "Department," and Evergreen Legal Services, 2018 Smith Tower, Seattle, Washington, hereinafter referred to as "Contractor," for the purpose of providing legal services to inmates committed to the Department.

I. OBJECTIVE AND SCOPE:

 A. The Department and the Contractor agree that the objective and scope of this contract agreement are as described herein or by attachments if so noted.

 1. The Contractor shall provide the necessary staff, office space, supplies, and equipment to carry out the duties of this contract agreement as set forth in the text of this contract agreement and in the attachments hereto.

 2. Services provided by the Contractor shall be in accordance with the expressed intent of Section 72.09.190 RCW and this contract agreement.

 3. Inmates eligible for services to be rendered by the Contractor under this contract agreement are those individuals committed to the custody of the Department and whose individual or family's yearly income meets or falls below the 125 percent (125%) of the Federal Poverty Income Level, as established by the Community Services Administration, Office of Management and Budget, United States Government. Unless otherwise provided herein, inmates eligible for legal services

under this contract agreement shall not include those inmates who (a) can afford to pay for such services, or (b) are customarily represented by the private bar on a contingency fee basis, such as fee generating claims or money damages claims, or (c) are customarily afforded legal representation in criminal matters by other public agencies or officials, i.e., public defender's office.

4. The scope of the services provided under this contract agreement shall not include the solicitation of legal action or the initiation or support of class actions. Representation shall be individually oriented.

5. The services, priorities, and reporting requirements set forth herein are necessary to provide inmates access to the courts, to comply with Section 72.09.-190 RCW and to comply with state budget and accounting requirements. In addition to any other remedies provided by law or stated herein, the Department and the Contractor agree that the failure to perform any of the duties of this contract agreement shall constitute a breach of contract and may result in the termination of this contract agreement.

B. The Department may award other contract agreements for legal services, and the Contractor shall use its best efforts to cooperate with such other contractors.

## II. COMPENSATION:

A. The Department and Contractor agree that payment shall be as follows:

1. In consideration of all services provided under this contract agreement, the Department shall upon receipt of a properly executed invoice voucher (A19), made out in triplicate, pay in arrears to the Contractor the sum of $9,166.66 per month.

2. Maximum payment to the Contractor for all services rendered under the terms of this contract agreement shall not exceed $220,000.

B. Contractor shall document work hours for reimbursement purposes as set forth below:

1. All hours worked must be supported by documentation as required by the reports submitted in accordance with Article V, *MONITORING AND EVALUATIONS;* and with the paragraph entitled *RECORDS, DOCUMENTS, AND AUDITS* contained in the attached Exhibit "B," *General Terms and Conditions.*

2. Twice a year Contractor shall provide the Department with a summary staff hours provided under the terms of this contract agreement for the preceding six (6) months. This summary shall be due on January 31 and July 31, except that the summary due at the end of the initial term, and any renewal term, of this contract agreement shall be due on July 10.

3. If, as a result of the above summary, it is determined that the hours provided during the preceding six (6) months do not meet or exceed one-half of the minimum hours required for that period stated in subsection 2.1 of the STATEMENT OF WORK, a pro-rata adjustment will be made to the next month's billing with adjustments to the last six-month period of the agreement being made on the final agreement billing. Adjustment rates will be those stated in subsection B(5) of this Article.

4. Hours in excess of the stated minimum may be carried over into the next six-month period upon approval from the Department. The actual number of hours approved to be carried over shall be at the discretion of the Department. Hours in excess of the stated minimum during each six month period shall not be reimbursed.

5. In addition to adjustments made in subsection II(b)(3), adjustments may be made to Contractor's compensation should it be determined, on a quarterly basis, that Contractor failed to provide any of the services required by this contract agreement, such as classes. Payment may be withheld until such

time as the services are provided or may be reduced pro-rata in accordance with the rate set forth below:

$13.18 per hour of attorney service

$17.04 per hour of litigation coordinator service

$ 8.41 per hour of support staff service

Provided, however, the Contractor may, with the approval of the Department, make up the deficiency in services required during the three (3) month period following the quarter. Should the Contractor's performance remain deficient at the end of the three (3) month make-up period, payment shall be reduced pro-rata in accordance with the above rates. Disputes regarding the reduced payment shall be resolved in accordance with the Department's policy directive on legal services contracts (Policy No. 130.410) prior to submission of the dispute to arbitration.

C. All invoice vouchers shall be mailed to the following address:

Department of Corrections
Division of Management and Budget
Accounting Section
P O Box 9699, Mail Stop FN–61
Olympia, Washington 98504

All invoices shall reference this contract agreement number CDOP1162.

D. In accordance with RCW 72.09.-190(5), the total due the Contractor as compensation, fees, or reimbursement under the terms of this contract agreement shall be reduced by the total of any other compensation, fees, or reimbursement received by the Contractor for the performance of legal services required under this contract agreement. Any amount received by the Contractor under this contract agreement which is not due under this section shall be returned by the Contractor to the Department within twenty (20) days.

III. TERM:

A. The term of this contract agreement will begin on the 1st day of July 1985, and shall continue through the 30th day of June 1986, unless sooner terminated as provided herein.

B. This contract agreement may be renewed as set forth below:

1. Unless sooner terminated prior to the renewal date, this contract agreement will be automatically renewed upon the expiration of the first agreement term of July 1, 1985, through June 30, 1986, unless any audit findings indicate the Contractor's performance did not meet the requirements, terms, and conditions specified herein. The Department reserves the right to modify or amend the contract agreement at the time of renewal. Renewal will authorize continuation of services required by this contract agreement for the period of July 1, 1986, through June 30, 1987. The Department reserves the right to renew this contract agreement, with any modifications or amendments it may want to include, subject to sufficient legislative appropriation for the renewal period, for an additional two (2), one-year terms, beginning on the 1st day of July 1987. Any modifications or amendments to the contract agreement at the time of renewal which result in an increase or decrease in cost of performing the duties required herein shall include language to appropriately adjust the payment made under this contract agreement. The maximum period during which the Department may contract with the Contractor before issuing a new Request for Proposal is from the effective date of this contract agreement through June 30, 1989.

2. Unless sooner terminated, the Department will notify the Contractor, in writing, at least sixty (60) days prior to June 30 of each year stating the Department's intent to renew this contract agreement for an additional one-year term and any modifications or amendments it intends to include, or to terminate the contract agreement at the end of the term.

## IV. DEPARTMENT/CONTRACTOR PERSONNEL:

A. The Department representative who will act for the Department in coordinating work of the Contractor will be the Director, Division of Prisons, or his/her designee, hereinafter referred to as "Contract Monitor."

B. The Contractor shall designate a Contract Manager. The Contract Manager shall maintain supervision on a routine and continuing basis of all agreement activities and personnel involved with this contract agreement.

C. The Contractor agrees to list on separate attachment hereto, names and social security numbers of personnel supplying services to the Department at the time of execution of this contract agreement. If the names are not known at the time of the execution of the contract agreement, the Contractor will submit the name or names and social security number(s) as they become known. Such persons shall, for all purposes, be employees, or independent contractors operating under the control of the Contractor, and nothing herein shall be construed to create an employment relationship between the Department and the persons listed on separate attachment.

D. Contractor's Federal Identification Number is 91–0974503.

E. The Department shall exercise no managerial responsibilities over the Contractor or his/her employees. In carrying out this contract agreement, it is expressly agreed that there is no employment relationship between the contracting parties.

F. All employees of the Contractor directly involved with delivery of legal services requested by the inmates, and who must perform those duties/responsibilities within the confines of the institution(s) covered by this contract agreement, will be required to successfully pass a criminal history record check conducted by the Department as a pre-requisite for access to the institution(s) covered under this contract agreement. The criminal history record check may be conducted by the Washington State Patrol through fingerprint identification. Should the criminal history record check of Contractor's employee(s) show prior convictions, approval of the Secretary must be obtained in writing prior to continued access by Contractor's employee(s) to the covered institution(s).

The Contractor's employees visiting the institution(s) will be issued identification cards or tags. These cards or tags may include a photograph at the option of the Department. All cards or tags must be returned to the Department upon the Contractor's employee's cessation of services to the institution(s).

G. All Contractor employees whose duties include the visitation of the institution(s) covered under this contract agreement will be required to participate in an orientation session at each institution. The orientation session shall be conducted no later than August 1, 1985.

## V. MONITORING AND EVALUATIONS:

A. The Department reserves the right to audit both the Contractor's compliance with this contract agreement and the qualitative work product. Audits will be performed in such manner as to preserve the attorney-client privilege.

B. The Department may conduct an audit of this contract agreement within six (6) months after the beginning date of performance. The results of this audit will be made known to the Contractor within thirty (30) days following the close of the audit. The Contractor will respond to the findings of the audit in accordance with established Department procedures. A follow-up audit may be conducted by the Department within six (6) months after the initial audit and annually thereafter. This language shall not be construed to limit the number of audits that the Department may conduct during the term of this contract agreement.

C. At a minimum, a monthly report shall be submitted by the Contractor to the Contract Monitor no later than thirty (30) days after the end of each calendar month. The monthly report shall include, but is not limited to, hours worked by Contractor's employees, activities conducted at the insti-

tution(s), i.e., library classes, interviews, and intake summaries. The format for these reports shall be provided by the Department and shall be the same or equivalent to that in attached Exhibit "C." Monthly reports shall be made for each institution covered by this contract agreement.

A quarterly report shall be submitted by the Contractor to the Contract Monitor no later than thirty (30) days after the end of each calendar quarter. The quarterly report shall include, but is not limited to, case activity (pending cases, new cases, and closed cases), client contact hours, research hours, cumulative hours on cases, attorney calls at the institution(s), cumulative attorney time, number of inmates seen, and quarterly expenditures. The format for this report shall be provided by the Department and shall be the same or equivalent to that in attached Exhibit "D." Quarterly reports shall be submitted by contract area.

The format and the content of these reports may be changed by the Department with sixty (60) day's notice to the Contractor.

It is understood and agreed by the Contractor and the Department that the quarterly report identified as "Individual Case Activity" shall be coded to protect the identity of the individual inmate. Staff member's name and case numbers shall be coded by the Contractor to allow reference by the Contractor and/or independent auditor to the individual file. All case activity will be reported by the Contractor on a quarterly basis; provided, however, that should it be determined that the reporting of active cases violates the Code of Professional Responsibility, as adopted by the Supreme Court of the state of Washington, then the Contractor shall report only those cases which have been closed.

## VI. DISCLOSURE:

Pursuant to DR4–101(c)(3) of the Code of Professional Responsibility (CPR), as adopted by the Supreme Court of the state of Washington, a lawyer may reveal the intention of his/her client to commit a crime and the information necessary to pre-

vent the crime. While both parties to this contract agreement recognize that the fiduciary relationship existing between the Contractor and the inmate is necessary for full development of facts essential to proper representation of the inmate, it is agreed that the disclosure of an expressed intent to commit a crime does not prevent the assimilation of facts essential to proper representation of the inmate for which the Contractor has agreed to provide services. Therefore, the Contractor will be expected to disclose the intention to commit a crime and the necessary information to prevent the crime as soon as practicable after receiving such information. Failure or refusal of the Contractor to comply with this Article may result in the individual possessing such knowledge being refused further visitations at the Department's institutions and/or the termination of this contract agreement.

## VII. ACCESS TO RECORDS/SAFEGUARDING INFORMATION:

A. Inmate's institutional records, which are a matter of public record, will be available for inspection or copying in accordance with Chapter 137–08 WAC, as now existing or as hereafter amended; provided, however, there shall be no charge to the Contractor for copying inmate records which are necessary for the representation of the inmate and which may not be removed from the institution. Indiscriminate copying of entire inmate files may result in the assessment of copying charges. Requests to review additional information must be presented by the attorney, paralegal, or law student seeking the information on a form approved by the institution and in accordance with applicable state and federal laws.

The Contractor shall not disclose the contents of any inmate record or the result of any psychological tests of inmates or interviews conducted under this contract agreement in a way which would allow the identification of a particular inmate publicly or to persons employed by the Contractor who do not have specific need to know such

information. This provision shall not be construed to prohibit disclosure in any judicial or administrative action brought under this contract agreement.

## VIII. ACCESS TO INMATES/OFFICE FACILITIES:

Only inmates scheduled for interviews in advance will be available for consultation; provided, however, that inmates may be seen by the Contractor without appointments upon written authorization from the inmate and with the approval of the institution authorities.

In the event of a lockdown, access by the Contractor to the inmates, their records, and any other material contained within the institution may be restricted by the superintendent of said institution. The restriction shall be discretionary on the part of the superintendent in view of the existing conditions at the institution.

The Department shall provide, in accordance with available space at each institution, an interview room for use by the Contractor. This room shall be available for all scheduled appointments with inmates and related activities on an as-needed basis and shall provide a confidential setting for inmate interviews.

## IX. TRANSPORTATION OF INMATES:

The Department assumes responsibility for transporting the inmates to and from the appropriate court facilities for appearances related to actions brought under this contract agreement where a court of competent jurisdiction so orders. This paragraph shall not be construed to create any additional right of inmates to appear at the Department's expense. Nor shall this section create additional responsibility in the Department for providing security for these appearances.

## X. WORK STANDARDS/INSURANCE REQUIREMENTS:

A. The performance of work and services under this contract agreement by the Contractor shall conform to high professional standards, and those of the Washington State Bar Association.

B. Contractor will provide and maintain current throughout the duration of the contract agreement malpractice, personal liability, property damage, and workmen's compensation insurance.

C. Contractor hereby warrants that all professional staff of the Contractor will be covered under professional liability insurance. Documentation attesting to this requirement will be provided the Department upon initiation of this contract agreement, and will be maintained current throughout the duration of this contract agreement.

## XI. CONFLICT OF INTEREST/CLAIMS FOR MONEY DAMAGES:

In cases in which there is a conflict of interest which may result in an eligible inmate being denied legal services by the Contractor, the inmate shall be notified, in writing, consistent with the ethical responsibilities of the Contractor. Efforts will be made by the Contractor to secure other counsel at no cost to the Department.

Inmates seeking representation for claims which are fee generating or involve claims for money damages may be represented by the Contractor provided at least three (3) contacts/attempts are made to refer the inmate to members of the private bar not employed by the Contractor. If the Contractor is unable to secure other counsel and undertakes representation of the inmate, the Contractor shall document the efforts made and send a copy of such documentation to the Contract Monitor. No compensation, fees, or reimbursement other than that sum set forth in Section II(A) of this contract agreement shall be received by the Contractor for services provided for money damages claims.

## XII. CONFLICTING EMPLOYMENT:

As the attorney-client relationship exists between the inmate and the Contractor, the Contractor should not accept proffered employment if there is a reasonable probability that such employment will affect adversely the advice to be given or services to be rendered present or future inmates for whom the Contractor has agreed to provide

legal services. DR5–105(a) of the CPR states that a lawyer shall decline proffered employment if the exercise of his/her independent professional judgment on behalf of a client will or is likely to be adversely affected by acceptance of such employment. Therefore, to ensure full representation of the eligible inmate population to be served by his/her contract agreement, Contractor shall take affirmative action to avoid rendering legal assistance to individuals outside of this contract agreement where such assistance will or is likely to adversely affect his/her professional judgment on behalf of clients represented pursuant to this contract agreement. This provision shall not be construed to prevent representation of one inmate in an action involving another inmate.

## XIII. GRIEVANCES:

The Contractor will comply with the procedures approved by the Department for inmate grievances. Remedies for inmate grievances shall not require performance on the part of the Contractor outside the scope of this contract agreement or inconsistent with the terms and conditions of this contract agreement.

### EXHIBIT A

### STATEMENT OF WORK

## 1. SERVICE AREA:

Except as provided in subsections 3.1 and 3.2 of Exhibit "A," the Contractor shall provide legal services for eligible inmates and perform other duties as set forth herein for the following institutions:

Washington Corrections Center, Shelton, Washington

McNeil Island Corrections Center, Steilacoom, Washington

Purdy Corrections Center for Women, Gig Harbor, Washington

## 2. GENERAL REQUIREMENTS:

2.1 The Contractor shall provide the necessary staff, office space, supplies, and equipment to carry out the duties of this contract agreement as set forth herein.

Minimum staff levels to be provided by the Contractor are as follows:

Full-time staff will include:

1. Staff Attorney—A minimum of 1,540 hours per year;
2. Staff Attorney—A minimum of 1,540 hours per year;
3. Secretary.

Part-time staff will include:

1. Litigation Coordinator—A minimum of 385 hours per year;

A minimum number of 200 attorney hours shall be worked each thirty (30) day period regardless of the cumulative number of hours worked during the period of this contract agreement.

2.2 Permanent changes in staffing levels or minimum number of service hours must be approved in writing by the Secretary of the Department. If the absence for more than three consecutive weeks of a staff member assigned by the Contractor to provide services under this contract agreement cannot be covered by comparable staff not assigned to the contract agreement, the Contractor shall notify the Department in writing. Provisions shall be made by the Contractor at no additional cost to the Department to secure the services of private attorneys who have relevant expertise to cover during this period. Appropriate adjustments shall be made in the rate of reimbursement.

2.3 Attorneys providing legal services under this contract agreement for which the Contractor seeks reimbursement from the Department, shall be active members of the Washington State Bar Association. Attorneys shall have a minimum of two years experience in practicing law (one of which occurred in the state of Washington). Attorneys with less than two years experience or with no experience practicing law in Washington may be utilized provided they are under the *direct* supervision of an attorney exceeding those requirements located in the *same* office.

2.4 Paraprofessional assistance must be under the direct on-site supervision of an experienced attorney. "On-site supervision" shall be deemed to occur when the

supervising attorney is officed with those persons he/she is supervising and has direct, face-to-face contact with such persons at least three time per week.

2.5 The Contractor is not obligated to provide legal service to all eligible inmates at the institutions covered under this contract agreement. Professional judgment regarding merit must be exercised prior to accepting any case within the priorities, time and staffing limitations set by this contract agreement.

The Contractor will maintain case load levels consistent with professional standards. To assist in the assessment and acceptance of case activities, the following general priorities will be used in screening new requests from inmates for legal assistance:

A. Provision of legal assistance regarding Washington State law issues for inmates transferred out of state; for example, personal restraint petitions or petitions for habeas corpus challenging convictions under Washington law;

B. Problems requiring legal assistance which may prejudice the inmate or the issue upon delay;

C. Personal restraint or habeas corpus matters;

D. Disciplinary or other adversary hearing before the Board of Prison Terms and Paroles.

E. Domestic relations issues (Purdy Corrections Center for Women inmates only).

F. Civil Rights claims dealing with conditions of confinement, segregation, detainer, medical, dental, etc.;

G. General civil problems such as dissolution, custody/support, non-physical injury claims;

H. Injury to inmate claims; and

I. Legal assistance relating to death penalty issues.

Within these broader categories, specific case priorities will be set by the Contractor and reviewed at least biannually. To the extent that the Contractor must prioritize otherwise meritorious claims, the Contractor will consider the following factors, among others:

A. The potential merit of an inmate's claims;

B. The impact on the client that the possible outcomes would carry;

C. The estimated resources necessary to adequately pursue a claim.

The Department places a high priority on the provision of legal services to minority inmates. The Contractor shall, subject to the above priorities, take affirmative action to ensure that minority inmates' requests for legal assistance for meritorious claims are reviewed and assisted expeditiously.

Consistent with professional and ethical considerations, the Contractor shall provide a detailed report to the Department further setting priorities within the broad categories set forth in this paragraph. Said report shall be sent to the Contract Monitor within sixty (60) days after the effective date of this contract agreement.

2.6 The Contractor shall exhaust all informal means of resolving a legal complaint or dispute prior to the filing of any court proceeding. When the Contractor determines that all reasonable means for informally resolving the complaint have been exhausted, the Contractor shall notify the Department's Attorney General's Division of a potential case thirty (30) days prior to filing the case, except in circumstances which, in the Contractor's judgment require that the case be filed more rapidly. In the event Contractor determines an action must be filed immediately, the Contractor shall make all reasonable effort to notify the Department's Attorney General's Division of the imminent action.

2.7 To ensure that claims from inmates requesting legal services are reviewed and appropriately handled according to those procedures required under Paragraphs 2.5 and 2.14, the Contractor shall integrate the provision of telephone access with written communications from the inmate and personal appointments by providing all or any combination of the following:

A. A local access number so that an inmate with access to a local line

may contact the legal services provider;

B. A toll-free number for inmates to call; or

C. Accept collect calls.

2.8 Once per quarter, a class will be presented to interested inmates by staff attorneys on the proper use of legal process and the limitation of various legal and administrative remedies. Classes will run one and one-half hour to two hours each.

The Contractor shall offer education and training in the following areas:

A. General civil matters unrelated to institutional life.

B. Writ of Habeas Corpus and personal restraint petitions.

C. Basic principles and rights relating conditions and treatment within the institution.

The subject matter of any classes in addition to those mentioned above shall be approved in advance by the Secretary.

2.9 Once every six (6) months a class will be presented to interested inmates by staff attorneys on the proper use of the law library. Additional assistance in legal writing will be made available to the inmates through the use of standardized forms and class activities. Contractor shall develop standardized forms for use by the inmates as appropriate. Classes will run one and one-half hour to two hours each.

The Contractor may utilize video tapes to provide the basic skills for inmates in performing legal research and using a law library. Video tapes have been developed in this area by the Department. The video tapes may be available to inmates on a regular basis. Where appropriate, staff attorneys shall supplement the tapes and provide specialized training dealing with legal research and using the law library. Whenever possible, attempts will be made to obtain assistance from representatives of legal publishing companies or other volunteers to supplement the video tapes and classes. The content of the supplemental classes will depend both on the scope of the video presentation and the questions which are posed by inmates.

2.10 During the first year of the contract agreement, video tapes may, at the option of the Department, be prepared by the Contractor in coordination with other contracted legal services providers for the use of inmates in pre-release status. The Contractor may obtain volunteer assistance in preparing the video tapes from attorneys who specialize in the various substantive areas to be covered. Video tapes may be prepared in the following areas:

A. Housing/Tenants' Rights—This would include basic rights of tenants as well as practical tips in dealing with landlords and in obtaining housing.

B. Debtor and Consumer Rights—This would include advice in dealing with collection agencies or loan companies, signing contracts, and it would include advice as to what exemptions are available for individuals who have incurred debts. Practical consumer tips, such as how to buy a car, may also be included.

C. Family Law—Information will be provided by video tape regarding marriage, divorce, paternity rights, child support, obligations, including support enforcement obligations and adoption.

D. Public Benefits—A brief tape will be provided outlining the various types of programs which are available, who is eligible for such programs, and how to apply for benefit programs.

E. Miscellaneous tape including rights and responsibilities of parolees; employment and employees' rights and responsibilities.

Video tapes and other materials may be utilized to provide legal instruction or information to the inmate. Such tapes would be made available through the institution's law libraries. The Contractor shall provide staff attorneys at no additional charge to assist in the making of these tapes and other materials.

2.11 The Contractor shall conduct client interviews at least two (2) days per month at each institution. The Department will

cooperate in assisting with the scheduling. If possible, the Contractor will provide twenty-four hours notice to designated officers at the respective institutions of which clients are to be interviewed. The Contractor will also spend additional time in direct client contact by telephone with clients involved in existing cases. At the request of the Contractor, the Department and Contractor will review the appropriateness of the number of required interview days. Changes to the number of required interview days requires prior written consent of the Department.

2.12 Contractor's staff members will meet periodically with client groups and representative in order to inform them of legal developments or pending legal actions which affect the client population generally and in order to obtain from them input on where there is a need for Contractor's services and how Contractor's services could be improved. This paragraph shall not be construed to authorize the Contractor to participate or provide assistance in any class action suit involving prison conditions under this contract agreement.

2.13 The Contractor will purchase and/or acquire the necessary materials, equipment, and supplies for the program and shall maintain an inventory of said equipment. If the funds received under this contract agreement are not sufficient for the above items, the Contractor may request such items from other sources with the approval of the Secretary. Said equipment shall include, but not be limited to, copiers and office equipment.

2.14 Consistent with the Code of Professional Responsibility as adopted by the Supreme Court of the state of Washington and within thirty (30) days after the effective date of this contract agreement, the Contractor shall establish written procedures acceptable to the Department for the operation of this program. A copy of those procedures shall be sent to the Contract Monitor. The procedures shall clearly identify those individuals assigned by the Contractor to work under this contract agreement, the job titles, description, and responsibilities of those individuals assigned, case-

load processing and limitations and any appropriate time frames or schedules. A copy of all substantive changes to these procedures shall be provided the Department. Noncompliance with this paragraph or with the procedures established pursuant to this paragraph may result in withholding of payment to the Contractor until compliance is had.

2.15 The Contractor shall provide information about the services they provide for use in the orientation at the Washington Corrections Center. In addition, the Contractor shall make printed information available for distribution at intake at the covered institution(s), maintain access information provided by other contractors for advising clients known to be leaving a covered institution if they requested services and the Contractor had not begun providing the service.

2.16 The Contractor may consult with the Contract provider of the other institutions when possible to prevent duplicative effort. Where relevant, the Contractor shall share internal brief bank material with other contract providers upon request. The Contractor shall cooperate with other contract providers in the preparation of records, interviews of witnesses, etc. No charges for these services will be assessed the other contract providers by the Contractor.

3. SPECIAL REQUIREMENTS:

3.1 The Contractor shall be responsible to provide legal services to all eligible inmates transferred from a Washington institution covered under this contract agreement in accordance with those limitations set forth in the text of this contract agreement. Inmates placed in correctional facilities out of state shall be served by the Contractor in the same manner as are in-state inmates with the exception that face-to-face interviews will be conducted only under exceptional circumstances. Travel by the Contractor to and from the state of confinement must be approved by the Department prior to the Contractor purchasing such travel services. The Contractor shall accept requests from out-of-state in-

mates for copies of Washington statutes, regulations, decisions, and other legal matter which is not available to the inmate at his/her place of confinement. The Contractor may transmit these requests to the institution's law library. The institutions will, in their discretion, loan or provide copies of the requested material to the Contractor to transmit to the requesting inmate. If in the day-to-day handling of requests for legal services by out-of-state inmates, there are problems for which the Contractor cannot provide assistance, but which raise access-to-the-courts issues, the Contractor will advise the Department of such problems in as much detail as possible (consistent with confidentiality restrictions) at the earliest possible date. Consistent with professional and ethical considerations, the Contractor shall report to the Department on a quarterly basis the types of requests received which were denied as lacking factual or legal merit or requiring excessive research time.

The Contractor shall attempt to handle all issues regarding Washington State law issues in a Washington forum. Court appearances in the out-of-state forum shall be a last resort and are subject to those limitations expressed within this contract agreement.

The Department shall provide the Contractor with the names and addresses of all inmates confined in out-of-state institutions within thirty (30) days after the effective date of this contract agreement. This list shall be updated at least once each quarter or as otherwise necessary. The Contractor shall be responsible for notifying all inmates to be served by them of the legal services available to them, including any limitations and restrictions on that access. The Contractor shall, within its discretion, accept collect telephone calls for those out-of-state inmates who are eligible for legal services, have meritorious claims and who have an active file open or accepted by the Contractor.

3.2 If an inmate is transferred to another state institution not covered by this contract agreement after acceptance by the Contractor to provide legal services, the Contractor may cease to provide legal ser-vices to the transferred inmate consistent with DR2–110 of the CPR.

If representation of the inmate is ended, the inmate will be notified of the existence of the other providers of legal services covering the state institution to which the inmate has been transferred. If representation may not be ended consistent with DR2–110 of the CPR, the Contractor may count hours worked on the case of the transferred inmate toward the required number of hours to be provided under this contract agreement; *provided,* that the minimum number of service hours provided inmates residing in institutions covered under this contract agreement shall be no less than an average of 220 hours per month during a one-year term. This paragraph shall not be construed to allow the Contractor to provide excessive legal services to inmates confined in other state institutions.

3.3 It is understood by the Contractor that the Department may terminate this contract agreement in accordance with the provisions contained herein or may elect not to extend the period of performance beyond the original term set forth in the text of this contract agreement. Legal representation of inmates under this contract agreement for which the Contractor does not desire or may not withdraw pursuant to DR2–110 of the CPR, shall be continued after the termination or expiration of this contract agreement at the sole expense of the Contractor; *provided,* however, that the Department may elect to extend this contract agreement up to thirty (30) days under this provision. The Contractor shall accept no new clients and will invoice the Department at the rate of $16.45 per attorney hours worked up to a maximum of $5,000 during the period of the extension. Such payments are contingent upon sufficient legislative appropriations and continuing statutory authority to provide legal services to inmates.

EXHIBIT B

DEPARTMENT OF CORRECTIONS

GENERAL TERMS AND CONDITIONS

DEFINITIONS—As used throughout this contract agreement, the following terms shall have the meanings set forth below:

A. "Contractor" shall mean that agency, firm, provider, organization, individual or other entity performing services under this contract agreement. It shall include any subcontractor retained by the prime contractor as permitted under the terms of this contract agreement.

B. "Secretary" shall mean the Secretary of the department and his/her delegates authorized in writing to act on his/her behalf.

C. "Department" shall mean the Department of Corrections (DOC) of the state of Washington, any division, section, office, unit, or other entity of the department, or any of the officers or other officials lawfully representing that department.

D. "Subcontractors" shall mean one *not* in the employment of the contractor, who is performing all or part of those services under this contract agreement under a separate contract agreement with the contractor. The terms "subcontractor" and "subcontractors" mean subcontractor(s) in any tier.

E. "Contracts Administrator" shall mean the Administrator of the department's Office of Contracts and Regulations, or his/her delegates.

F. "Minority" means a person who is a citizen or lawful permanent resident of the United States and who is:
(1) Black: Having origins in any of the black racial groups of Africa;
(2) Hispanic: Of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;
(3) Asian American: Having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands; or
(4) American Indian or Alaskan Native: Having origins in any of the original peoples of North America.

G. "OMWBE" means the Office of Minority and Women's Business Enterprises of the state of Washington.

H. "Minority Business Enterprise," "Minority–Owned Business Enterprise," or "MBE" means a business organized for profit, performing a commercially useful function, which is owned and controlled by one or more minority individuals or businesses in which one or more minorities or MBEs certified by the OMWBE own at least 51 percent (51%), or in the case of a corporation at least 51 percent (51%) of the voting stock, and control at least 51 percent (51%) of the management and daily business operations of the business.

I. "Women's Business Enterprise," "Women–Owned Business Enterprise," or "WBE" means a business organized for profit, performing a commercially useful function, which is owned and controlled by one or more women or women's business enterprises certified by the OMWBE. Owned and controlled means a business in which one or more women or WBEs certified by the OMWBE own at least 51 percent (51%), or in the case of a corporation at least 51 percent (51%) of the voting stock, and control at least 51 percent (51%) of the management and daily business operations of the business. The women owners must be United States citizens or lawful permanent residents.

CONTRACTOR NOT EMPLOYEE OF DEPARTMENT—The contractor, his/her employees or agents performing under this contract agreement are *not* employees or agents of the department. The contractor will not hold himself/herself out as nor claim to be an officer or employee of the department or of the state of Washington by reason hereof, nor will he/she make any claim of right, privilege, or benefit which would accrue to a civil service employee under Chapter 41.06 RCW.

NONDISCRIMINATION—During the performance of this contract agreement, the contractor shall comply with all requirements of federal, state, and local nondiscrimination statutes and regulations. These requirements include, but are not limited to:

A. Nondiscrimination in employment: The contractor shall not discriminate against any employee or applicant for employment because of race, color, sex, religion, national origin, creed, marital status, age, or the presence of any sensory, mental or physical handicap. This requirement does not apply, however, to a religious corporation, association, educational institution or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

The contractor shall take affirmative action to ensure that employees, including apprentices and volunteers, are employed and treated during employment without discrimination because of their race, color, religion, sex, national origin, creed, marital status, age, or the presence of any sensory, mental, or physical handicap. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion, or transfer, recruitment, and selection for training.

B. Nondiscrimination in Client Services: The contractor shall not, on grounds of race, color, sex, religion, national origin, creed, marital status, age, or the presence of any sensory, mental, or physical handicap:

1. Deny an individual any services or other benefits provided under this contract agreement.

2. Provide any service(s) or other benefits to an individual which are different, or are provided in a different manner, from those provided to others under this contract agreement.

3. Subject an individual to segregation or separate treatment in any manner related to the receipt of any service(s) or other benefits provided under this contract agreement.

4. Deny any individual an opportunity to participate in any program provided by this contract agreement through the provision of services or otherwise, or afford an opportunity to do so which is different from that afforded others under this contract agreement. The contractor, in determining (1) the types of services or other benefits to be provided; (2) the class of individuals to whom, or the situation in which, such services or other benefits will be provided; or (3) the class of individuals to be afforded an opportunity to participate in any services or other benefits, will not utilize criteria or methods or administration which have the effect of subjecting individuals to discrimination because of their race, color, sex, religion, national origin, creed, marital status, age, or the presence of any sensory, mental, or physical handicap.

C. Noncompliance with Nondiscrimination Requirements—In the event of the contractor's noncompliance or refusal to comply with the nondiscrimination requirements this contract agreement may be rescinded, cancelled, or terminated, in whole or in part, and the contractor may be declared ineligible for further contracts with the department. The contractor shall, however, be given a reasonable time in which to cure this noncompliance. Any dispute may be resolved in accordance with the "Disputes" procedure set forth herein.

POLICIES AND PROCEDURES—In connection with such services rendered hereunder, the contractor agrees to comply with applicable Department policies and procedures relative to custody of inmates and security of the institution such as: fingerprinting, photographs for identification purposes, searches, and lockdown procedures. Failure to comply with these applicable policies and procedures may result in the contractor's employee(s) being refused access to the institution(s) or the termination of the contract agreement.

UTILIZATION OF MINORITY–OWNED AND WOMEN–OWNED BUSINESSES— During the performance of this contract agreement the contractor shall comply with Chapter 39.19 RCW, as now existing or hereafter amended, any rule adopted under that Chapter by OMWBE, and/or any policy or regulations adopted by the depart-

ment to effect agency compliance with that Chapter.

It is the policy of the Department that minority-owned and women-owned businesses shall have the maximum practicable opportunity to participate in the performance of contracts awarded by the Department. A goal of 9.1 percent of the total dollar volume of any contract awarded by the Department shall be awarded to minority business enterprises, and 3.0 percent of the dollar volume of any contract awarded by the Department shall be awarded to women's business enterprises. The Contractor shall use best efforts to carry out this policy in the award of any subcontracts and/or in the purchase of supplies and materials to the fullest extent consistent with the efficient performance of this contract agreement.

In the event that the contractor fails to comply with the requirements set forth in the above paragraph, the department may withhold payment, debar, suspend, or terminate this contract agreement. In addition, noncompliance may subject the contractor to civil penalties of 10 percent (10%) of the amount of the contract agreement or Five Thousand ($5,000) Dollars, whichever is less. Willful repeated violations, exceeding a single violation, may disqualify the contractor from further participation in state contracts for a period of one year. Compliance with this contract agreement provision must be met prior to receiving additional contract awards by any state or educational institution.

If the contractor prevents or interferes with any subcontractor's compliance with these provisions, or submits false or fraudulent information to the department regarding compliance with this provision, the contractor shall be subject to a fine not to exceed One Thousand ($1,000) Dollars, in addition to any other penalties or sanctions prescribed by law.

BILLING PROCEDURES—The contractor's compensation for goods and services rendered under this contract agreement shall be as set forth in the text of the contract instrument attached hereto. Any additional goods or services furnished by the contractor in excess of that set forth in the text of the contract instrument attached hereto must have prior written approval of the Secretary.

At the intervals prescribed by the department, the contractor shall submit an Invoice Voucher (Form A19) prepared in triplicate (original and two signed copies) in the manner prescribed by the department. Such vouchers shall contain a statement of contract services performed for which the contractor is seeking compensation. These vouchers shall be submitted with those reports required by this contract agreement.

Payment shall be considered timely if made by the department within 45 days after the date of receipt. The department may, in its sole discretion, withhold payments due the contractor for services rendered if the contractor fails to satisfactorily comply with any term or condition of this contract agreement.

INDEMNIFICATION—The contractor shall defend, protect and hold harmless the state of Washington, the department, or any employees thereof, from and against all claims, suits, or actions arising from any negligent or deliberate act or omission of the contractor or subcontractor, or agents of either, while performing under the terms of this contract agreement. Claims shall include, but not be limited to, assertions that the use of transfer of any software, book, document, report, film, tape or sound reproduction, or material of any kind, delivered hereunder, constitutes an infringement of any copyright, patent, trademark, tradename, or otherwise results in an unfair trade practice. The provisions of this section shall survive any termination or the expiration of this contract agreement.

COVENANT AGAINST CONTINGENT FEES—The contractor warrants that no person or selling agency has been employed or retained to solicit or secure this contract agreement upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agency maintained by the contractor for the purpose of

securing business. The department shall have the right, in the event of breach of this clause by the contractor, to annul this contract agreement without liability or, in its discretion, to deduct from the contract price or consideration or otherwise recover the full amount of such commission, percentage, brokerage, or contingent fee. The provisions of this section shall survive any termination or the expiration of this contract agreement.

CONFLICT OF INTEREST—The department may, by written notice to the contractor:

A. Terminate the right of the contractor to proceed under this contract agreement if it is found, after due notice and examination by the Contracts Administrator that gratuities in the form of entertainment, gifts, or otherwise are offered or given by the contractor, or an agent or representative of the contractor, to any officer or employee of the department, with a view towards securing this contract agreement or securing favorable treatment with respect to the awarding or amending or the making of any determinations with respect to this contract agreement.

B. In the event this contract agreement is terminated as provided in (A) above, the department shall be entitled to pursue the same remedies against the contractor as it could pursue in the event of a breach of the contract agreement by the contractor. The rights and remedies of the department provided for in this clause shall not be inclusive and are in addition to any other rights and remedies provided by law. The existence of facts upon which the Contracts Administrator makes any determination under this clause shall be an issue and may be reviewed as provided in the "Disputes" clause of this contract agreement.

TREATMENT OF ASSETS—

A. Title to all property furnished by the department shall remain in the department. Example: The department pro-
vides desks for contractor staff. Title to desks remain in the department.

B. Title to all property purchased by the contractor, the cost of which the contractor is entitled to be reimbursed as a direct item of cost under the contract agreement, shall pass to and vest in the department upon delivery of such property to the contractor. Example: The contractor purchases equipment which is a budget line item. Title passes to and vests in the department.

C. Title to all property, the costs of which is directly or indirectly reimbursed by the department, shall pass to and vest in the department upon delivery of such property to the contractor. Example: Contractor receives all income from the department. There are no other sources of funds. Although the item may not be listed in the budget, title will pass to and vest in the department upon delivery since the costs of the item has been paid by department funds.

D. Any property of the department furnished to the contractor shall, unless otherwise provided herein, or approved by the Contracts Administrator, be used only for the performance of this contract agreement.

E. The contractor shall be responsible for any loss or damage to property of the department which results from the negligence of the contractor or which results from the failure on the part of the contractor to maintain and administer that property in accordance with sound management practices, and shall maintain an inventory of department property.

F. Upon the happening of loss or destruction of, or damage to any department property, the contractor shall notify the Contracts Administrator thereof and shall take all reasonable steps to protect that property from further damage.

G. The contractor shall surrender to the department all property of the department prior to settlement upon comple-

tion, termination, or cancellation of this contract agreement.

H. All purchases of equipment by contractors for programs administered by contractors are to be received at the institution/location for control and tagging and entry into the Property Management System (PMS) before distribution to the contractor for use.

I. All references to the contractor under this clause shall include any of his/her employees, agents, or subcontractors.

NONASSIGNABILITY—The contractor may not assign any of the contractor's duties, obligations, rights, or claims assumed or created under this contract without the express prior written consent of the department signed by the Secretary. The provisions of this section shall survive any termination or the expiration of this contract agreement.

RECORDS, DOCUMENTS, AND AUDITS —The contractor shall maintain such books and records and utilize generally accepted accounting principles, practices, and internal controls necessary to reflect sufficiently, accurately, and properly all direct and indirect costs of any nature expended in the performance of this contract agreement. These records shall be subject at all reasonable times to inspection, review, or audit by personnel duly authorized by the department. Should an audit conducted under the authority of this section disclose that the contractor has been paid by the department in excess of the agreed upon costs (overpayment), or has been reimbursed by the department for direct or indirect costs which are disallowed as a result of that audit, then, in either event, the contractor shall, upon demand by the department, repay such overpayment or reimbursement to the department. The contractor will retain all books, records, documents, and other material relevant to this contract agreement for five years after settlement, and make them available for inspection by persons authorized under this provision. The provisions of this section shall survive any termination or the expiration of this contract agreement.

SAFEGUARDING OF INMATE INFORMATION—The use or disclosure by any party of any information concerning an inmate for any purpose not directly connected with the administration of the department's or the contractor's responsibilities with respect to services provided under this contract agreement is prohibited, except by written consent of the department or inmate, or his/her legal representative.

The contractor agrees to abide by present and future federal and state laws and regulations in maintaining the confidentiality of agency files and records, including Criminal History Record Information (CHRI). In the event CHRI is provided to the contractor, the contractor shall abide by all present and future department rules and regulations governing the use of CHRI information and shall require any of the contractor's authorized personnel having access to CHRI to strictly adhere to the same. The provisions of this section shall survive any termination or the expiration of this contract agreement.

RIGHTS IN DATA—Unless otherwise provided, data which originates from this contract agreement shall be "works for hire" as defined by the U.S. Copyright Act of 1976 and shall be owned by the department. Data shall include, but not be limited to, reports, documents, pamphlets, advertisements, books, magazines, surveys, studies, computer programs, films, tapes, and/or sound reproductions. Ownership includes the right to copyright, patent, register, and the ability to transfer these rights.

Data which is delivered under the contract agreement, but which does not originate therefrom, shall be transferred to the department with a nonexclusive, royalty-free, irrevocable license to publish, translate, reproduce, deliver, perform, dispose of, and to authorize others to do so; *Provided*, that such license shall be limited to the extent which the contractor has a right to grant such a license. The contractor shall exert all reasonable efforts to advise the department, at the time of delivery of data furnished under this agreement, of all known or potential invasions of privacy

contained therein and of any portion of such document which was not produced in the performance of this contract agreement. The department shall receive prompt written notice of each notice, claim, or copyright infringement received by the contractor with respect to any data delivered under this contract agreement. The department shall have the right to modify or remove any restrictive makings placed upon the data by the contractor. The provisions of this section shall survive any termination or the expiration of this contract agreement.

SUBCONTRACTING—The contractor shall not enter into subcontracts for any of the work contemplated under this contract agreement without obtaining prior written approval of the Contracts Administrator of the department or his/her delegate.

LICENSING AND ACCREDITATION STANDARDS—The contractor shall comply with all applicable local, state, and federal licensing and accrediting requirements/standards, necessary in the performance of this contract agreement.

INDUSTRIAL INSURANCE COVERAGE —As required by statutes or regulations, the contractor shall provide or purchase industrial insurance coverage prior to performing work under this contract agreement. The department will not be responsible for payment of industrial insurance premiums or for any other claim or benefit for the contractor, or any subcontractor, or employee of the contractor, which might arise under the industrial insurance laws during performance of duties and services under this contract agreement.

RIGHT OF INSPECTION—The contractor shall provide right of access to its facilities to the department, or any of its officers, or to any other authorized agent or official of the state of Washington or the federal government at all reasonable times, in order to monitor and evaluate performance, compliance, and/or quality assurance under this contract agreement.

ADVANCE PAYMENTS PROHIBITED— No payment in advance or in anticipation of services or supplies to be provided under this contract agreement shall be made by the department.

SAVINGS—In the event funding from state, federal, or other sources is unavailable, withdrawn, reduced, insufficient, or limited in any way, the department may terminate the contract agreement under the "Termination for Convenience" clause, (without the five-day notice requirement) subject to renegotiation under any new funding limitations and conditions.

WAIVER OF DEFAULT—Waiver of any default shall not be deemed to be a waiver of any subsequent default. Waiver of breach of any provision of the contract agreement shall not be deemed to be a waiver of any other or subsequent breach and shall not be construed to be a modification of the terms of the contract agreement, unless stated to be such in writing, signed by the Secretary of the department, and attached to the original contract agreement.

CHANGES AND MODIFICATIONS—The Secretary may, at any time, by written notification to the contractor, and without notice to any known guarantor or surety, make unilateral changes in the scope of the services to be performed under the contract agreement, the period of performance, or the price. These unilateral changes shall be effective as set forth in the amendment to the contract agreement or upon signature by the Secretary, if no date has been set forth.

The contractor will be deemed to have accepted any such unilateral change unless the contractor notifies the department's Contracts Administrator of the contractor's nonacceptance of such unilateral change within fifteen (15) calendar days after the date the change notice is signed by the Secretary. If the contractor so notifies the department of such nonacceptance, the contractor and the department will use good faith efforts to negotiate a change acceptable to both parties. Failure to agree on an acceptable change shall be a dispute concerning a question of fact within the meaning of the clause of these General Terms and Conditions entitled "Disputes." However, nothing in this clause shall ex-

cuse the contractor from proceeding with the contract agreement as changed, provided such unilateral changes do not require the contractor to violate the code of Professional Responsibility contained in the *Rules of Court.*

DISPUTES—Except as otherwise provided in the contract agreement, should a dispute arise between the parties hereto, with respect to the terms of this contract or the performance thereof, and it cannot be resolved informally, the parties shall refer the dispute to an independent arbitrator selected by mutual agreement of the contractor and the department. The arbitrator so chosen shall establish procedures for an arbitration hearing and shall render a decision resolving the dispute. The arbitrator's decision shall be binding on both parties, unless either party delivers written objection to the decision to the non-objecting party within ten (10) days after receiving the decision by the arbitrator. The arbitrator's fee will be shared equally by the parties, but neither party shall be financially responsible for the costs incurred by the other party in connection with the arbitration. The parties agree that this dispute process shall precede the commencement of any legal action.

Should either party hereto commence any action in a state or federal tribunal with respect to the dispute decided by arbitration hearing, then the party bringing the action shall bear all court costs and attorney fees if the decision of the arbitrator is substantially upheld. If the decision of the arbitrator is not upheld, then each party shall bear its own costs and attorney fees.

TERMINATION FOR DEFAULT—The Secretary may, by written notice, terminate the contract agreement in whole or in part, for failure of the contractor to perform any of the provisions hereof. In such event, the contractor shall be liable for damages as authorized by law, including, but not limited to, any cost difference between the original contract agreement and the replacement or cover contract agreement and all administrative cost directly related to the replacement contract agreement, i.e., cost of the competitive bidding, mailing, advertising, and staff time; *Provided,* that

if (i) it is determined for any reason the contractor was not in default, or (ii) the contractor's failure to perform is without his/her and/or his/her subcontractor's control, fault or negligence, the termination shall be deemed to be a Termination for Convenience.

TERMINATION FOR CONVENIENCE—Except as otherwise provided in this contract agreement, the Secretary may, by thirty (30) days' written notice, or the contractor may, by ninety (90) days' written notice, beginning on the second day after the mailing, terminate this contract agreement, in whole or in part, when it is in the best interests of the department or the contractor. If this contract agreement is so terminated, the department shall be liable only for payment in accordance with the terms of this contract agreement for services rendered prior to the effective date of termination.

TERMINATION PROCEDURE—Upon termination of this contract agreement, the department, in addition to any other rights provided in this contract agreement, may require the contractor to deliver to the department any property specifically produced or acquired for the performance of such part of this contract agreement as has been terminated. The provisions of the "Treatment of Assets" clause shall apply in such property transfer.

The department shall pay to the contractor the agreed upon price, if separately stated, for completed work and services accepted by the department, and the amount agreed upon by the contractor and the Secretary for (a) completed work and services for which no separate price is stated, (b) partially completed work and services, (c) other property or services which are accepted by the department, and (d) the protection and preservation of property, unless the termination is for default, in which case the Secretary shall determine the extent of the liability of the department. Failure to agree with such determination shall be a dispute within the meaning of the "Disputes" clause of this contract agreement. The department may

withhold from any amounts due the contractor for such completed work or services such sum as the Secretary determines to be necessary to protect the department against potential loss or liability.

The rights and remedies of the department provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract agreement.

After receipt of a notice of termination, and except as otherwise directed by the Secretary, the contractor shall:

1. Stop work under the contract agreement on the date, and to the extent specified, in the notice;

2. Place no further orders or subcontracts for materials, services, or facilities except as may be necessary for completion of such portion of the work under the contract agreement as is not terminated;

3. Assign to the department, in the manner, at the times, and to the extent directed by the Secretary, all of the rights, titles, and interest of the contractor under the orders and subcontracts so terminated, in which case the department has the right, at its discretion, to settle or pay any or all claims arising out of the termination of such orders and subcontracts;

4. Settle all outstanding liabilities and all claims arising out of such termination or orders and subcontracts, with the approval or ratification of the Secretary to the extent he/she may require, which approval or ratification shall be final for all the purposes of this clause;

5. Transfer title to the department and deliver in the manner, at the times, and to the extent, if any, as directed by the Secretary, any property which, if the contract agreement had been completed, would have been required to be furnished to the department;

6. Complete performance of such part of the work as shall not have been terminated by the Secretary; and

7. Take such action as may be necessary, or as the Secretary may direct, for the protection and preservation of the property related to this contract agreement which is in the possession of the contractor and in which the department has or may acquire an interest.

GOVERNING LAW—This contract agreement shall be governed by the laws of the state of Washington. Any action brought hereunder must be brought in Thurston County, Washington.

SEVERABILITY—If any provision of this contract agreement or any provision of any document incorporated by reference shall be held invalid, such invalidity shall not affect the other provisions of this contract agreement which can be given effect without the invalid provision, and to this end the provisions of this contract agreement are declared to be severable.

CONSTRUCTION—Nothing in this contract agreement shall be construed to create a right enforceable by or in favor of any third party.

## EXHIBIT C

## DEFINITIONS

1. "Staff Member Name/Position" means the full name of the individual providing the legal service and his/her position within the structure of the law firm or legal services corporation. For example, John Q. Smith/Staff Attorney; Mary J. Williams/Litigation Coordinator; or Jack T. Allen/Paralegal.

2. "Total Hours Worked" means the cumulative number of hours worked in providing services under the contract by the staff member during the reporting period, including client contact hours, research hours, administrative hours, and travel hours.

3. "Client Contact Hours" means face-to-face and telephone consultations.

4. "Research Hours" means hours spent in preparation of litigation/hearings, drafting of legal documents, legal research or briefing, negotiation, factual investigation/discovery, correspondence.

5. "Number of Inmates Seen" means the total number of individual inmates seen in face-to-face consultations at an institution. Multiple interviews of the same inmate shall be counted as one inmate seen.
6. "Number of Inmates Requesting Service" means the total number of individual persons committed to the custody of the Department of Corrections that have requested legal service by verbal or written means.
7. "Number of Inmates Refused Service" means the number of persons committed to the custody of the Department of Corrections for which the provision of legal services was denied on the basis of insufficient information, insufficient merit, ineligibility, law priority, or other like reasons.
8. "Number of New Cases Opened" means the total number of new individual files opened for a single inmate upon one request. The total number includes the inmates to whom legal consultation provided was limited to the rendering of a view or opinion by the attorney as to the relative merits of the inmate's request with no further legal services intended to be provided.
9. "Number of Cases Closed" means the total number of cases that are no longer active, not including closed cases/advice only.
10. "Number of Cases Closed/Advice Only" means the total number of cases that are no longer active that resulted in only an opinion or view of the attorney as to the relative merits of the inmate's request or direction as to legal self-help.
11. "Administrative Hours" means non-client related contact with the institution or headquarters, recruitment, staff training, and record keeping and reporting.
12. "Number of Inmates Out-of-State Requesting Service" means the total number of individual persons committed to the custody of the Department of Corrections and transferred to or are incarcerated in a penal institution outside of the state of Washington that have requested legal service by verbal or written means.
13. "Number of Fee Generating Cases" means the total number of cases retained by the legal service provider which are required by contract to be referred, if possible, to the private bar.

## MONTHLY REPORT
### CDOP

| STAFF MEMBER NAME/POSITION | TOTAL HOURS WORKED | CLIENT CONTACT HOURS | TRAVEL HOURS | RESEARCH HOURS | ADMINISTRATIVE HOURS | NUMBER OF INMATES SEEN |
|---|---|---|---|---|---|---|
| | | | | | | |

| # OF INMATES REQUESTING SERVICE | # OF INMATES REFUSED SERVICE | # OF NEW CASES OPENED | # OF CASES CLOSED | # OF CASES CLOSED/ADVICE ONLY |
|---|---|---|---|---|
| | | | | |

| CLASSES PROVIDED THIS MONTH | STAFF MEMBER CONDUCTING | DAYS/DATE | TIMES/HOURS | INMATE ATTENDANCE |
|---|---|---|---|---|
| | | | | |

MONTHLY REPORT

C0DOP

INTAKE SUMMARY

| CASE CATEGORY CODE NUMBER | CASE CATEGORY | NUMBER OF NEW CASES OPENED |
|---|---|---|
| 101 | Social Security | |
| 102 | VA/Military | |
| 103 | Internal Revenue Service | |
| 104 | L & I/Workmen's Comp/Ins. | |
| 105 | Bankruptcy/Debtor Creditor | |
| 106 | Consumer | |
| 107 | Wills, Trusts, Probates | |
| 108 | Name Changes/Adoptions | |
| 109 | Housing/Real Estate | |
| 110 | Divorce/Annulment | |
| 111 | Custody/Guardianship/Visit.Rts. | |
| 112 | Torts/Damage Claims | |
| 113 | Drivers License/Tickets | |
| 114 | Crim. Contact Outside Atty. | |
| | | |
| 201 | Detainer | |
| 202 | Habeas Corpus | |
| 203 | Post–Conviction | |
| 204 | Cert–Mandamus | |
| 205 | Administrative Hearing | |
| 206 | Parole Board Disciplinary Hearing | |
| 207 | Parole Board .100 Hearing | |
| 208 | Parole Board Minimum Term Setting | |
| 209 | Other Parole Board Matters | |
| 210 | Institutional Disciplinary Matters | |
| 211 | Leave or Extended Leave | |
| 212 | Visitation/Phone Privileges | |
| 213 | Mailroom/Money | |
| 214 | Medical/Dental | |
| 215 | Placement/Transfer | |
| 216 | Segregation | |
| 217 | Treatment or Habilitation | |
| 218 | Personal Restraint Petition | |
| 219 | Inmate Marriages | |
| 220 | Clothing | |
| 221 | Shelter | |
| 222 | Sanitation | |
| 223 | Religion | |
| 224 | Public Records | |
| 225 | Sentencing Guidelines | |
| 226 | Privacy | |
| 227 | Protective Custody | |
| 228 | Institutional Industries | |
| 229 | Good Time/Earned Time | |
| 230 | Death Penalty | |
| 231 | Use of Force | |
| 232 | Exercise | |
| 233 | Other | |

## MONTHLY REPORT
### CDOP
### SUMMARY

| STAFF POSITION | TOTAL HOURS WORKED | CLIENT CONTACT HOURS | TRAVEL HOURS | RESEARCH HOURS | ADMINISTRATIVE HOURS | NUMBER OF INMATES SEEN |
|---|---|---|---|---|---|---|
| | | | | | | |

| # OF INMATES REQUESTING SERVICE | # OF INMATES ELIGIBLE FOR SERVICE | # OF INMATES REFUSED SERVICE | # OF INMATES OUT-OF-STATE REQUESTING SERVICE | # OF INMATES OUT-OF-STATE REFUSED SERVICE |
|---|---|---|---|---|
| | | | | |

| # OF NEW CASES OPENED | # OF CASES CLOSED | # OF CASES CLOSED/ADVISE ONLY | # OF FEE GENERATING |
|---|---|---|---|
| | | | |

## EXHIBIT D
### DEFINITIONS

1. Excepting the Quarterly Report identified as "Individual Case Activity," "Staff Member Name/Position" means the full name of the individual providing the legal service and his/her position within the structure of the law firm or legal services corporation. For example, John Q. Smith/Staff Attorney; Mary J. Williams/Litigation Coordinator; or Jack T. Allen/Paralegal.

2. "Total Hours Worked" means the cumulative number of hours worked in providing services under the contract by the staff member during the reporting period, including client contact hours, research hours, administrative hours, and travel hours.

3. "Client Contact Hours" means face-to-face and telephone consultations.

4. "Research Hours" means hours spent in preparation of litigation/hearings, drafting of legal documents, legal research or briefing, negotiation, factual investigation/discovery, correspondence.

5. "Number of Inmates Seen" means the total number of individual inmates seen in face-to-face consultations at an institution. Multiple interviews of the same inmate shall be counted as one inmate seen.

6. "Number of Inmates Requesting Service" means the total number of individual persons committed to the custody of the Department of Corrections that have requested legal service by verbal or written means.

7. "Number of Inmates Refused Service" means the number of persons committed to the custody of the Department of Corrections for which the provision of legal services was denied on the basis of insufficient information, insufficient merit, ineligibility, law priority, or other like reasons.

8. "Number of New Cases Opened" means the total number of new individual files opened for a single inmate upon one request. The total number includes the inmates to whom legal consultation provided was limited to the rendering of a view or opinion by the attorney as to the relative merits of the inmate's request with no further legal services intended to be provided.

9. "Number of Cases Closed" means the total number of cases that are no longer active, not including closed cases/advice only.

10. "Number of Cases Closed/Advice Only" means the total number of cases that are no longer active that resulted in only an opinion or view of the attorney as to the relative merits of the inmate's request or direction as to legal self-help.

11. "Administrative Hours" means non-client related contact with the institution or headquarters, recruitment, staff training, and record keeping and reporting.

12. "Number of Inmates Out-of-State Requesting Service" means the total number of individual persons committed to the custody of the Department of Corrections and transfered to or are incarcerated in a penal institution outside of the state of Washington that have requested legal service by verbal or written means.

13. "Number of Fee Generating Cases" means the total number of cases retained by the legal service provider which are required by contract to be referred, if possible, to the private bar.

## QUARTERLY REPORT
## CDOP
## SUMMARY

| STAFF POSITION | TOTAL HOURS WORKED | CLIENT CONTACT HOURS | TRAVEL HOURS | RESEARCH HOURS | ADMINISTRATIVE HOURS | NUMBER OF INMATES SEEN |
|---|---|---|---|---|---|---|
| | | | | | | |

| # OF INMATES REQUESTING SERVICE | # OF INMATES ELIGIBLE FOR SERVICE | # OF INMATES REFUSED SERVICE | # OF INMATES OUT OF STATE REQUESTING SERVICE | # OF INMATES OUT OF STATE REFUSED SERVICE |
|---|---|---|---|---|
| | | | | |

| # OF NEW CASES OPENED | # OF CASES CLOSED | # OF CASES CLOSED/ADVICE | # OF FEE GENERATING CASES |
|---|---|---|---|
| | | | |

## QUARTERLY EXPENSES

PERSONNEL EXPENSES NON–PERSONNEL EXPENSES

| POSITIONS | COSTS | ITEM | COST |
|---|---|---|---|
| | $ | Telephone | $ |
| | | Postage | |
| | | Travel | |
| | | Office | |
| | | Supplies | |
| | | Copying | |
| | | Litigation Expenses | |
| | | Library | |
| | | Equipment | |
| | | Insurance | |
| | | Training | |
| TOTAL PERSONNEL | $ | TOTAL NON–PERSONNEL | $ |
| TOTAL PERSONNEL | $ | | |
| TOTAL NON–PERSONNEL | $ | | |
| TOTAL EXPENSES | $ | | |

QUARTERLY REPORT

C0DOP

INTAKE SUMMARY

| CASE CATEGORY CODE NUMBER | CASE CATEGORY | NUMBER OF NEW CASES OPENED |
|---|---|---|
| 101 | Social Security | |
| 102 | VA/Military | |
| 103 | Internal Revenue Service | |
| 104 | L & I/Workmen's Comp/Ins. | |
| 105 | Bankruptcy/Debtor Creditor | |
| 106 | Consumer | |
| 107 | Wills, Trusts, Probates | |
| 108 | Name Changes/Adoptions | |
| 109 | Housing/Real Estate | |
| 110 | Divorce/Annulment | |
| 111 | Custody/Guardianship/Visit.Rts. | |
| 112 | Torts/Damage Claims | |
| 113 | Drivers License/Tickets | |
| 114 | Crim. Contact Outside Atty. | |
| | | |
| 201 | Detainer | |
| 202 | Habeas Corpus | |
| 203 | Post–Conviction | |
| 204 | Cert–Mandamus | |
| 205 | Administrative Hearing | |
| 206 | Parole Board Disciplinary Hearing | |
| 207 | Parole Board .100 Hearing | |
| 208 | Parole Board Minimum Term Setting | |
| 209 | Other Parole Board Matters | |
| 210 | Institutional Disciplinary Matters | |
| 211 | Leave or Extended Leave | |
| 212 | Visitation/Phone Privileges | |
| 213 | Mailroom/Money | |
| 214 | Medical/Dental | |
| 215 | Placement/Transfer | |
| 216 | Segregation | |
| 217 | Treatment or Habilitation | |
| 218 | Personal Restraint Petition | |
| 219 | Inmate Marriages | |
| 220 | Clothing | |
| 221 | Shelter | |

| CASE CATEGORY CODE NUMBER | CASE CATEGORY | NUMBER OF NEW CASES OPENED |
|---|---|---|
| 222 | Sanitation | |
| 223 | Religion | |
| 224 | Public Records | |
| 225 | Sentencing Guidelines | |
| 226 | Privacy | |
| 227 | Protective Custody | |
| 228 | Institutional Industries | |
| 229 | Good Time/Earned Time | |
| 230 | Death Penalty | |
| 231 | Use of Force | |
| 232 | Exercise | |
| 233 | Other | |

QUARTERLY REPORT

CDOP

INDIVIDUAL CASE ACTIVITY

| STAFF MEMBER NAME/POSITION | CASE NUMBER | CASE CATEGORY CODE | TOTAL HOURS WORKED | CLIENT CONTACT HOURS | RESEARCH HOURS |
|---|---|---|---|---|---|

## APPENDIX B

United States District Court for the Western District of Michigan

Gary Knop, John Ford, William Lovett, II, Ramando Valeroso, Gus Jansson, Pat Sommerville, Vernard Cohen, T. Jon Spytma, Robert Shipp, Butch Davis, Ron Mixon, and Kerwin Cook, individually and on behalf of all other persons similarly situated, Plaintiffs,

v

Perry M. Johnson, Robert Brown, Jr., Dale Foltz, John Jabe, Theodore Koehler, John Prelesnik, and Jack Bergman, Defendants.

File No. G84–651

ORDER

Order issued: May 5, 1988 by Judge Richard Enslen, W.D.Mich. [EXERPT ONLY: Pages 9 through 18 concerning "Access to the Courts"]

### IV. ACCESS TO COURTS

*A. Legal Access Program*

1. The MDOC shall contract with a non-profit corporation that will provide paralegal services in the subject institutions to assist prisoners in making collateral attacks upon their convictions and in challenging the conditions of their confinement.

a. The MDOC may choose to contract with an existing non-profit legal services corporation, such as Prison Legal Services at SPSM, provided that the authority and staff of such corporation are expanded consistent with the requirements of this Order.

b. The MDOC shall award the contract referred to in this paragraph within ninety (90) days of the date of this Order, unless it shows cause why, acting with all deliberate speed, the contract cannot be awarded within that time period.

2. Board of Directors:

a. Composition: The Board of Directors of this corporation shall consist of seven members, selected as follows (unless the MDOC decides to contract with an already existing program which has a board of directors or its equivalent):

(i) three members selected by defendants;

(ii) three members selected by the plaintiffs;

(iii) one member selected by a vote of the appointed members who shall serve as chair.

b. Term: The members of the Board of Directors shall serve two-year terms, without compensation.

c. The Board of Directors shall hire and supervise the Legal Program Director pursuant to paragraph IV(A)(3) of this Order.

d. Bylaws: The Board of Directors shall develop bylaws for the operation of the legal access program which bylaws shall be submitted to the Court for approval within ninety (90) days of the Board's appointment. The bylaws shall, at a minimum, address the following issues:

(i) Standards for determining which prisoners are entitled to receive the services of the program. These standards should, at a minimum, provide the following services;

(A) general research assistance to any prisoner using a law library;

(B) assistance in drafting pleadings, responding to motions or to reports and recommendations for inmates who are illiterate, who do not speak English or who are otherwise unable to translate their complaints into an organized presentation;

(C) the standards shall be designed to insure that the program provides only the minimum amount of service constitutionally required.

(ii) Duties of civilian paralegals hired pursuant to paragraph IV(A)(4)(a) of this Order, which shall include:

(A) periodic visits to segregation units, protective custody units and other areas of the institutions where inmates do not have direct access to a main law library;

(B) the frequency with which these visits must be made;

(C) prompt response to written prisoner requests for paralegal assistance;

(D) conducting inventories of main and mini law libraries and submitting orders for replacement or duplicate copies of library materials;

(E) regular "desk hours" in law libraries to provide general research assistance to prisoners using the libraries, including the times such assistance will be available, and the portion of the paralegal's work hours devoted to such assistance;

(F) regular "office hours" to discuss particular cases with clients unable to use the library; including how such visits will be scheduled and supervised and the portion of the paralegal's work hours devoted to such assistance;

(G) scheduling of law library time for general population prisoners (call-outs), including scheduling time for meetings between "jailhouse lawyers" and other prisoners and between prisoner paralegals and other prisoners;

(H) delivery of materials from the main law library to prisoners who would not otherwise have access to the main law library.

(iii) Duties of prisoner paralegals, hired pursuant to paragraph IV(A)(4)(b) of this Order, to include:

(A) regular "desk hours" at law libraries to provide general research assistance to prisoners;

(B) provision of research and drafting assistance to civilian paralegals;

(C) rules governing confidential conferences between prisoner paralegals and other prisoners, if any such conferences are to be allowed, and how those conferences should be scheduled and supervised.

(iv) Standards for denying program assistance, other than general research assistance to prisoners, and alternatives to be made available to prisoner if program assistance is denied. These standards should address the issues of:

(A) assaultive prisoners;

(B) prisoners who wish to proceed with frivolous complaints and/or prisoners who are excessively litigious;

(C) categories of cases the program shall not provide assistance for (e.g., cases for which equivalent services are already available).

e. Shakedowns and other security issues: The Board shall provide a means by which at least one civilian staff person is "on call" at all times (available 24 hours a day and within two hours of any department request) for the purpose of facilitating shakedowns pursuant to paragraph IV(A)(5)(d) of this Order. The Board shall insure that the appropriate departmental staff at each subject institution are aware

at all times of the identity and location of the staff person designated pursuant to this paragraph.

f. Annual Report: The Board shall prepare an annual report to be submitted to the Court and the parties. This report shall include annual case statistics, prisoner utilization data, a review of library inventories and replacement of materials or provision of duplicate materials, a review of staffing levels required pursuant to paragraph IV(A)(4)(a) and (b) of this Order and any recommendations the Board may have for the modification of any provision of this Order.

3. Program Director: The Board shall hire one program director who shall be an attorney licensed to practice in the State of Michigan. The Board shall conduct an annual performance evaluation of the Director.

a. The Director's salary and benefits shall be competitive with the salary and benefits provided to other attorneys employed by the State of Michigan.

b. The Director shall have the following duties:

(i) Hiring, training and supervision of civilian and prisoner paralegals at each institution;

(ii) Development of the training curricula for civilian and prisoner paralegals which shall include both substantive and procedural matters;

(iii) Processing of prisoner grievances regarding the law library, library collection and paralegals. All such grievances shall be made directly to the program director as a Step III grievance;

(iv) Approval of "jailhouse lawyer" contracts pursuant to the standards currently specified in PD–DWA–61.01 and Rule 791.-6617.

(v) The presentation of an annual report to the Board which shall include:

(A) performance evaluations of civilian and prisoner paralegals;

(B) annual case statistics, prisoner utilization data and recommendations for changes in staffing requirements.

4. Staffing Requirements: In addition to the Program Director, the following staff shall be provided at each institution:

a. Civilian Paralegals: Each institution shall have full-time civilian paralegals, who shall possess at least a two-year paralegal degree, as follows:

MBP: One for general population and trustee
One for segregation and protective custody

MR: One for general population and trustee
One for segregation and protective custody

SPSM North: One

SPSM South: One

b. Prisoner Paralegals:

(i) Each institution shall hire paid prisoner paralegals as follows:

MBP: 4

MB–Trustee: 2

MR: 5

MR–Trustee: 1

SPSM North: 3

SPSM South: 3

(ii) This position shall be a paid prison job assignment with wages comparable to those in Industries.

(iii) The department shall retain the right to transfer prisoner paralegals for disciplinary and other reasons consistent with sound corrections management. The department shall, however, insure that prisoner paralegals are not transferred for arbitrary or retaliatory reasons.

(iv) Prisoner paralegals shall be hired by the program director upon recommendation of the civilian paralegal and shall not be restricted by the prison job classification requirements. In the hiring process, the program director and civilian paralegal shall consider the candidate's skill, interests and length of sentence. When prisoners have equal skills and interest, the civilian paralegal shall recommend the prisoner with the longest sentence.

c. Inmate Law Clerks: Defendants shall either retain the inmate law clerks with their current duties and training or

provide a corresponding increase in the number of prisoner paralegals hired and transfer duties currently given to law clerks to the prisoner paralegals.

5. Physical Requirements

a. Sufficient office space will be provided for all civilian paralegals at or near the main law libraries with suitable privacy to conduct interviews with prisoner clients.

b. Hours of operation shall not be limited by the hours of operation of the law library.

c. Existing equipment and supplies shall be available to the program and shall include the following at each main law library office:

(i) photocopy machine;

(ii) electric typewriters;

(iii) telephone lines with access to both institutional and outside lines (provided, however, that prisoner paralegals shall not be allowed access to outside telephone lines).

d. All shakedowns of the areas in which the employees of the corporation work shall be done in the presence of the civilian paralegal or other civilian employee of the program designated pursuant to paragraph IV(A)(2)(d)(v) of this Order. Shakedowns shall be conducted in such a manner that Department employees do not read the legal materials and that the civilian paralegal or other employee is able to observe each Department employee as the search is carried out. Department employees shall conduct the search in such a manner as to assure only searches for contraband and not the reading of client files.

B. *Libraries*

1. The defendants shall supplement the required minimum collection at each main law library with at least one copy of the following materials:

a. A complete set of Wright and Miller, *Federal Practice and Procedure;*

b. Michigan Civil Jury Instructions

c. Local state court rules and the local rules for the Western and Eastern Districts of Michigan and for the Sixth Circuit;

2. The defendants shall supplement the required minimum collection at the main law library at Marquette Branch Prison with the materials noted in paragraph IV(B)(1) of this Order, and with a recent treatise on Habeas Corpus and Post–Conviction Remedies.

3. Defendants shall maintain the mini law libraries at each of the subject institutions and shall supplement the collection at each mini law library with the following materials:

a. Current PDs and OPs;

b. State Administrative Rules regarding the MDOC;

c. Pencils, writing and carbon paper, kite and grievance forms, and forms to request books from the main law library collection;

d. Posted instructions on obtaining assistance from the civilian paralegal and obtaining books from the main law library collection;

e. At least two chairs and suitable surface space for interviews with the civilian paralegals.

4. As an alternative to the maintenance of the mini law libraries pursuant to paragraphs IV(A)(6) and IV(B) of this Order, the defendants may choose to abolish the mini law libraries and to provide, instead, increased paralegal assistance to prisoners in segregation units. If the defendants adopt the latter alternative, defendants shall provide appropriate increases in the civilian and prisoner paralegal staff pursuant to paragraph IV(A)(4) of this Order and shall authorize the legal access program to provide all necessary legal services to all prisoners in segregation units. This will include all general research assistance as well as assistance in drafting pleadings and other legal documents. Defendants shall insure that paralegal assistance is provided to segregation prisoners who might not otherwise require such assistance, in order to replace the previously available self-help assistance provided by the mini law libraries. Nothing in this paragraph shall be construed to alter segregation prisoners' current level of access to materials from

the main law libraries on a call-out basis. Defendants shall inform the Court and the plaintiffs of their decision, as between these alternatives, within ninety (90) days of the date of this Order.

5. Defendants shall assure that prisoners at the Michigan Reformatory Trustee Division have access to the courts through either of the following means:

a. Establishment of a main law library with the required minimum collection and the supplements ordered in paragraphs IV(B)(1) and IV(B)(2) of this Order plus general research assistance and advice for prisoners who require it from a civilian or prisoner paralegal; or

b. Establishment of a mini law library pursuant to paragraph IV(B)(3) of this Order with access to the services of a civilian paralegal and to books from a main law library without the necessity of requesting a temporary transfer to another institution.

c. Defendants shall inform the Court and the plaintiffs of their decision, as between these alternatives, within ninety (90) days of the date of this Order.

6. Library Time:

a. Time in the mini law library shall not be restricted.

b. Time in main law libraries will be as follows:

(i) General population: Six (6) hours weekly, with additional time as needed and approved by the civilian paralegal;

(ii) Jailhouse Lawyers: No restriction for those prisoners providing legal assistance to other prisoners pursuant to defendant's policy directive PD–DWA–61.01 and Rule 791.6617.

c. Time spent in conference with the prisoner or civilian paralegals shall not be counted as law library time.

7. Inventories:

a. Defendants shall insure that each subject institution uses a standardized form to inventory main and mini law library collections. The current SPSM form is acceptable.

b. The civilian paralegal shall conduct inventories of the main and mini law libraries at lest semi-annually. Prisoner paralegals shall conduct inventories of the main law library collections for quarters during which the civilian paralegal does not conduct an inventory.

c. The semi-annual inventories conducted by civilian paralegals shall be submitted to the Program Director for review and to the librarian at each institution.

d. The civilian paralegal shall post the most recent inventories of the main and mini law library collections in each mini law library.

e. The Program Director shall submit to defendants a plan for standardizing the replacement of law library materials and for providing duplicate copies of those materials when needed. The plan shall create a standard for determining when a duplicate copy must be ordered and shall identify the individual(s) responsible for ordering duplicate and replacement materials.